306 So.2d 321 (1975)
Mrs. Pauline C. BRASHER, Plaintiff and Appellee and Appellant,
v.
LIFE INSURANCE COMPANY OF LOUISIANA et al., Defendants and Appellants and Appellees.
No. 4852.
Court of Appeal of Louisiana, Third Circuit.
January 15, 1975.
Rehearing Denied February 5, 1975.
Writ Refused April 11, 1975.
*323 Brittain & Williams by Jack O. Brittain, Natchitoches, for plaintiff-appellant-appellee.
Nelson & Achee by James C. Stevens and Harry Nelson, Shreveport, Watson, Murchison, Crews & Arthur by Raymond Arthur, Natchitoches, for defendant-appellee-appellant.
Before HOOD, CULPEPPER and MILLER, JJ.
CULPEPPER, Judge.
This is a suit for death benefits under two alleged credit life insurance policies. Plaintiffs, the widow and heirs of the deceased debtor, Francis M. Brasher, seek to recover the proceeds of the policies allegedly issued by the defendant, Life Insurance Company of Louisiana. In the alternative, plaintiffs seek to recover the face amount of the policies from the defendants, Exchange Bank & Trust Company and its employees, C. E. Dranguet, Ronald D. Roy and Herbert S. Cobb, based upon a breach of their duty to procure credit life insurance for Mr. Brasher. Plaintiffs also seek penalties and attorney's fees.
The trial judge awarded judgment against Life Insurance Company of Louisiania for the face amount of each policy, plus penalties and attorney's fees. Plaintiffs' alternative claim against the Bank and its employees was dismissed. The defendant insurer appealed. Plaintiffs appealed the dismissal of their alternative demand against the Bank and its employees.
The issues are: (1) Can the insurer escape liability on the basis of the "sound health" clause in its policy, where its agent was authorized to issue insurance "to debtors who appear to the agent to be in sound health upon receipt from such debtors of the premium"? (2) Is the insurer liable for the first loan in the sum of $1,025, as to which no certificate of insurance was actually issued, but the agent testified it was his "intention" to issue a certificate? (3) If the insurer is not liable on the loan where no certificate of insurance was issued, are the Bank and its employees liable for breach of a duty to procure insurance? (4) Is the defendant insurer liable for penalties and attorney's fees?
The facts show that in 1969 Mr. Herbert S. Cobb, president of the Exchange Bank & Trust Company, was contacted by Mr. John W. James, sales representative for Life Insurance Company of Louisiana. Pursuant to these negotiations, a "GROUP CREDITORS LIFE & TOTAL DISABILITY POLICY ON DEBTORS" was issued by the insurer to the Bank covering debtors of the Bank. An agreement was *324 also signed whereby Ronald D. Roy, an employee of the Bank, was named "Agent" to solicit credit life insurance. The commission agreement provided that the agent receive 60% of the premiums and that the remaining 40% would be forwarded to the insurer with monthly reports stating the names of the debtors, the amounts of the loans, the premiums, etc.
The commission agreement also provided that the agent could issue certificates of insurance to individual debtors on forms supplied by the insurer. These certificates contained the following provision:
"4. The insured named above must be alive, in sound health, and gainfully employed before the benefits of this certificate may be attached."
The group policy contained a similar provision as follows:
"No insurance shall take effect under this policy unless on the date hereof the debtor is alive, in sound health, and gainfully employed."
The commission agreement appointing Mr. Roy as agent contained this provision:
"2. The agent shall have authority to solicit credit life insurance within the aforesaid limitations on behalf of the company and to prepare and deliver individual policies on such form as is provided by the company and entrusted to the agent to debtors who appear to the agent to be in sound health upon receipt from such debtors of the premium stipulated by the company for the debtors of the above mentioned creditor." (Emphasis supplied)
Mr. Dranguet, a vice president of the Bank, explained the procedure generally followed in the issuance of credit life insurance: When the customer requested a loan, the bank officer asked if credit life insurance was desired. If the answer was yes, the officer had the customer sign a portion of the "Disclosure Statement of Loan" which states "I desire credit life insurance". This disclosure statement shows the net proceeds of the loan, the credit life insurance premium, the finance charge and the dates and amounts of the payments.
The disclosure statement signed by the customer did not designate which credit life insurance company would issue the policy. The Bank had group policies with several different insurance companies. The bank officer handling the loan selected the insurer. After the loan papers were completed and the note signed, the officer handling the loan designated on the face of the note the insurance company which would issue the certificate on that loan.
All of the loan papers then went to the note department, where the agent for that particular insurer issued a certificate of insurance based on the information furnished on the note and the disclosure statement. Mr. Cobb was the agent for some insurers, and Mr. Roy was agent for the defendant, Life Insurance Company of Louisiana. The certificates of insurance were kept in the note department. On the first of the next month the Bank sent a report to the insurer showing the names of the persons insured and paying to the insurer its portion of the premiums. Although the commission agreement in this case provided that 60% of the premiums would go to Mr. Roy as agent, actually none of the commissions went to Mr. Roy. The Bank kept the entire 60% of the premiums.
At the time of his death on April 5, 1973, Mr. Brasher had five loans outstanding with Exchange Bank, all of which were covered by credit life insurance. One was insured by Old Republic Life Insurance Company, which did not have a "sound health" provision in its policy. Old Republic paid the loan. Two other loans were insured by Cherokee Credit Life Insurance Company, which did have a "sound health" provision in its policy. Nevertheless, Cherokee paid these two loans.
The fourth loan was dated February 26, 1973, and was in the sum of $1,025. This loan was handled by Mr. Dranguet. In accordance *325 with the above procedure described by him, Mr. Brasher signed the disclosure statement requesting credit life insurance and the premium in the sum of $5.00 was paid by including it in the amount of the loan. A Bank employee then made the following notation at the bottom of the note: "INS. $5.00 (L/L)". This was to indicate that Life Insurance Company of Louisiana would issue the certificate of insurance. The loan papers were sent to the note department, but through some oversight no certificate of insurance was ever actually issued on this particular loan.
The fifth loan was dated March 20, 1973 and was in the sum of $6,318. This loan was also handled by Mr. Dranguet. Mr. Brasher signed the disclosure statement requesting credit life insurance. The premium of $221.11 was paid by including it in the amount of the loan. A certificate of insurance was issued showing an effective date of March 21, 1973. The certificate was placed in the files of the note department and it was included in the report to the defendant insurer at the end of the month.
The Life Insurance Company of Louisiana failed to pay either of the last two loans discussed. This suit followed.

THE "SOUND HEALTH" DEFENSE
The first defense urged by the insurer is based on the "sound health" clauses contained in the certificate and in the group policy as quoted above. The medical records show that in 1965 Mr. Brasher had his right leg amputated due to a vascular or circulatory insufficiency. He also had diabetes, but this was not sufficiently serious to require insulin. In February of 1971, Mr. Brasher was hospitalized for an episode of bleeding from his left groin. An old dacron vascular graft was removed and a new one inserted.
About ten days after the loan of $1,025 was made on February 26, 1973, Brasher again entered the hospital complaining of pain in his left lower abdomen. The diagnosis was an obstruction of the urethra, the tube from the bladder to the kidney. There were several possible causes, one of which was a kidney stone. Instead of surgery, conservative treatment was instituted. After Mr. Brasher remained free of pain for 48 hours, he was discharged from Schumpert Memorial Hospital in Shreveport on March 19, 1973.
He returned to Natchitoches, and on the next day, March 20, 1973, he went to the Bank and made the second of the two loans in question. Later during that same day, he developed another pain in his stomach. He was hospitalized overnight in Natchitoches. The diagnosis was another obstruction of the urethra. He was sent to the Willis-Knighton Hospital in Shreveport. On this occasion, surgery was performed. The post-operative diagnosis was retroperitoneal fibrosis with a possible retroperitoneal tumor. This was not in the area of his previous vascular trouble in his leg. Mr. Brasher appeared to be recovering from this surgery, but, unfortunately, he fell out of his bed while in the hospital and apparently this caused internal bleeding from the surgery or other causes. He died two days later, on April 5, 1973. The cause of death was stated to be upper gastrointestinal bleeding, probably secondary to a stress ulcer, with other possible contributing causes being the diabetes and vascular disease.
In connection with the "sound health" defense, it is important to note at the outset that when Mr. Brasher signed the requests for credit life insurance he was not asked any questions regarding the condition of his health, and he signed no statements as to his past or present health. Mr. Dranguet, who handled the loan for the Bank, testified that he knew Mr. Brasher's general health condition, knew he had a leg amputated, knew he had diabetes, and knew that he had been in the hospital from time to time. But Dranguet made no further inquiry as to Mr. Brasher's health. *326 Mr. Cobb also testified he knew generally about the condition of Mr. Brasher's health.
Furthermore, as far as the medical evidence shows, on the dates of both of these loans, i. e., the loan of February 26, 1973 in the sum of $1,025, and the loan on March 20, 1973 in the sum of $6,318, Mr. Brasher had no reason to think that he was in any worse health than he had been for several years. And all during these years he had made several loans from the defendant Bank covered by credit life insurance without any question whatsoever.
The present case is not one in which there was any false representation made by the insured as to the condition of his health. This suit is similar to Butler v. Vulcan Life & Accident Insurance Company, 179 So.2d 642 (La.App.2d Cir. 1965), in which the court stated:
"[2] Under the circumstances here presented, where the insurance company allows the creditor bank (as its agent) to issue a certificate upon belief the insured-debtor is in sound health and where no medical examination is required nor any questions asked concerning insured's prior or present health, we are of the opinion the bank was within its authority in issuing the certificate; that the insurance became effective immediately upon issuance of the certificate; and that the record evidences no fraud on the part of the bank or decedent. As a consequence the company is bound by the terms of the master policy and has waived any right to contest coverage under the incontestability clause."
For the above quoted reasons stated in the Butler case, we conclude the defendant insurer here cannot escape liability under the "sound health" clauses.
THE LOAN IN THE SUM OF $1,025.00 AS TO WHICH NO CERTIFICATE OF INSURANCE WAS ISSUED
The next issue concerns the loan made on February 26, 1973 in the sum of $1,025 as to which no certificate of insurance was issued. At the time the loan was made, a Bank employee placed the notation "INS. $5.00 (L/L)" on the note, indicating that credit life insurance was to be issued by Life Insurance Company of Louisiana. But, through some oversight in the note department, no certificate of insurance was issued on this loan.
In the answer filed on behalf of the defendant insurer, the Bank and the Bank's three employees, it is stated the Life Insurance Company of Louisiana assumes the defense of the other defendants as to the loan in the amount of $1,025. But in its brief filed in this Court, Life Insurance Company of Louisiana takes the position that its assumption of the defense of the other defendants is not equivalent to an assumption of the obligation to pay. The brief argues that Life Insurance Company of Louisiana is not obligated to pay the $1,025 because no certificate of insurance was issued on this loan.
The district judge apparently concluded that because Mr. Dranguet testified it was "intended" that a certificate of insurance on Life Insurance Company of Louisiana would issue, such "intention" sufficed to cause the insurer to be liable. We are unable to agree that a mere "intention" by the Bank or its employees to issue a policy is sufficient to bind the insurer.
THE LIABILITY OF THE BANK AND ITS EMPLOYEES FOR BREACH OF A DUTY TO PROCURE INSURANCE ON THE LOAN OF $1,025.00
The next issue is whether the Bank and/or its three employees named as defendants are liable for breach of their duty to procure insurance on the loan of $1,025. In this case, it is clear that the Bank, through its employee, Mr. Dranguet, acted as either an agent or a broker for Mr. Brasher to secure the insurance he requested. Having failed to procure the insurance which it agreed to obtain, and for *327 which it collected a premium, the Bank is liable for the damages sustained. The amount of the damages is $1,025. See Karam v. St. Paul Fire & Marine Insurance Company, 265 So.2d 821 (La.App.3rd Cir. 1972) and the authorities cited therein for the applicable law regarding the liability of agents and brokers who agree to procure insurance and fail to do so.
Although we conclude that the Bank is liable for the failure of its employees to secure the insurance requested, we find no liability on the part of the defendants, Dranguet, Roy or Cobb, because the evidence does not show that any of these three gentlemen individually breached an obligation to Mr. Brasher. The testimony is that the certificate was not issued because of a "break down" in the procedures in the note department. But no breach of duty is proved as to any of these three defendants individually.
PENALTIES AND ATTORNEY'S FEES
The district judge held that since the master policy in this case provided both life and disability insurance, the penalty provisions of LSA-R.S. 22:657 are applicable. The judgment appealed awards 12% penalties and attorney's fees of $2,000 against the defendant insurer.
The defendant insurer argues that LSA-R.S. 22:658 does not apply to death claims. We think this is correct. LSA-R.S. 22:656 provides for penalties of 6% on "[a]ll death claims arising under policies of insurance issued or delivered within this state." LSA-R.S. 22:657 provides for a penalty of double the amount of the benefits, together with attorney's fees, determined by the court, on "[a]ll claims arising under the terms of health and accident contracts issued in this state". LSA-R.S. 22:658 provides a penalty of 12% and reasonable attorney's fees on "[a]ll insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657." We think these statutes construed together clearly provide that R.S. 22:656 applies to all claims for death benefits regardless of whether the policy provides other types of benefits. R.S. 22:658 does not apply in the present case. LSA-R.S. 22:656 provides:
"All death claims arising under policies of insurance issued or delivered within this state shall be settled by the insurer within sixty days from the date of receipt of due proof of death and should the insurer fail to do so without just cause, then the amount due shall bear interest at the rate of six per cent per annum from date of receipt of due proof of death by the insurer until paid. Amended and reenacted Acts 1958, No. 125."
We conclude that the defendant insurer was "without just cause" in failing to pay the claim under the $6,318 policy. It admits this policy was issued. The evidence does not show which employee in the note department actually drew the certificate, but it does show the certificates were normally drawn by Mr. Roy or under his supervision. In the absence of proof to the contrary, this is sufficient to show the policy was issued or authorized by Roy.
The only defense seriously urged to the $6,318 policy is based on the sound health clause. The contention is that such clauses are recognized and given effect by our jurisprudence, Aucoin v. First National Life Insurance Company, 204 So.2d 703 (La. App.3rd Cir. 1967) and the authorities cited therein, and that in the present case the evidence shows the insured was not in sound health on the date the certificate was issued.
This is not "just cause" to refuse to pay benefits in the present case. The commission agreement clearly authorized the agent to issue the credit life insurance "to debtors who appear to the agent to be in sound health upon receipt from such debtors of the premium." (Emphasis supplied) When Mr. Brasher borrowed the $6,318 *328 and requested credit life insurance, the premium was paid and the certificate of insurance was issued, presumably by an authorized agent of the insurer. The decision as to whether Mr. Brasher appeared to be in "sound health" was left to the agent. No medical examinations or representations by Mr. Brasher as to the state of his health were required.
Clearly, the burden was on the defendant insurer to prove its "sound health" defense, Mataya v. Delta Insurance Company, 71 So.2d 139 (La.Ct. of App. Orl., 1954); Massachusetts Protective Association v. Ferguson, 168; La. 271, 121 So. 863 (1929). No evidence was introduced by the insurer showing that at the time the premium was paid and the policy was issued, Mr. Brasher did not appear to be in sound health. The only witnesses who testified in this regard were Mr. Cobb and Mr. Dranguet, and they stated that Mr. Brasher appeared to be in about the same state of health that he had been for several years.
We find the defendant insurer is liable under LSA-R.S. 22:656 for a penalty of 6% per annum from the date of receipt of proof of death by the insurer until paid on the death claim of $6,318.
Of course, the defendant insurer is not liable for penalties and attorney's fees on the claim for $1,025 as to which no insurance was issued. Nor is the Bank liable for penalties, since there is no statutory provision for penalties or attorney's fees by a party other than an insurer.
For the reasons assigned, the judgment appealed is amended and recast to read as follows: It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiffs, Mrs. Pauline C. Brasher, Carl Elton Imhoff, Thomas E. Brasher and Frances Elaine Gallusse, and against the defendant, Life Insurance Company of Louisiana, Inc., for the full sum of $6,318, plus a penalty of 6% per annum from the date of receipt of proof of death, May 10, 1973, until paid, and plus legal interest from date of judicial demand until paid.
It is further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiffs and against the Exchange Bank & Trust Company for the sum of $1,025, plus legal interest thereon from date of judicial demand until paid.
The claims of plaintiffs against Herbert S. Cobb, Ronald Roy and C. E. Dranguet are dismissed.
All costs in the trial and appellate courts are assessed against the defendants, Life Insurance Company of Louisiana, Inc. and Exchange Bank & Trust Company.
Affirmed, as amended.