335 So.2d 518 (1976)
Mrs. Dorothy WATSON
v.
LIFE INSURANCE COMPANY OF LOUISIANA et al.
Mrs. Dorothy WATSON
v.
The MINNESOTA MUTUAL LIFE INSURANCE COMPANY et al.
No. 10839a & b.
Court of Appeal of Louisiana, First Circuit.
June 30, 1976.
*519 Delos R. Johnson, Jr. and G. Wayne Kuhn Franklinton, for appellant.
Edward A. Griffis, Bogalusa, for appellees.
Before ELLIS, BLANCHE and LOTTINGER, JJ.
BLANCHE, Judge.
Mrs. Dorothy Watson, plaintiff-appellant, brought separate suits, consolidated for trial, against Minnesota Mutual Life Insurance Company and Life Insurance Company of Louisiana, defendants-appellees, to recover the proceeds of policies of credit life insurance allegedly issued by the two companies on the life of her husband, James W. Watson. From judgments rendered in favor of the defendants, plaintiff appeals. We affirm.
James W. Watson made application to Minnesota Mutual Life Insurance Company for credit life insurance on his mortgage loan with Standard Mortgage Corporation. The application form, dated April 29, 1972, was completed at the Watson home and mailed to the mortgagee or insurer.
Also, on April 29, 1972, Mr. Watson and his wife obtained a loan at Parish National Bank, at which time credit life insurance was requested to cover the amount of the loan. A certificate of credit life insurance was issued by Life Insurance Company of Louisiana reflecting an effective date of May 2, 1972.
Subsequently, on May 1, 1972, Mr. Watson consulted a urologist, Dr. B. F. Ponig, complaining of an inability to urinate. On May 2, 1972, Mr. Watson was admitted to St. Tammany Parish Hospital in Covington. A cystoscopy was performed on May 12, 1972, which disclosed a large bladder mass, later found to be a carcinoma originating in the sigmoid colon. Surgery performed on May 22, 1972, disclosed that the cancer was invading the lymph nodes and colon, making it inoperable. Mr. Watson subsequently died from the cancer on August 23, 1972. The insurance companies refused to pay the proceeds of the credit life policies to the beneficiary and these suits resulted.

MINNESOTA MUTUAL LIFE INSURANCE POLICY
The application form dated April 29, 1972, which was completed at the Watson home, contained the following questions:
"1. During the last three years, have you been hospitalized or have you consulted a physician for any reason?
"2. Have you ever been treated for or advised that you had any of the following: heart, lung, nervous or kidney disorder, high blood pressure, cancer or tumor, diabetes?" (Exhibit D-23, Record, p. 541)
Following these questions, the application additionally provided space on the application for response:
"If your answer to either question is yes, give particulars including name and address of physician and dates attended."
The application form discloses that Mr. Watson marked the square indicating an answer of "yes" to the first question after first indicating an answer of "no" and scratching it out. The second question was marked indicating a "no" response. In the space provided for particulars was written *520 the notation "over"; on the back of the application was the following notation:
"June 71Oschner [sic] Foundation Hospital 2 ruptured discsDr. Echols"
The evidence in the record indicates that Mr. Watson's medical history prior to the date of the application for insurance included hospitalization from April 15, 1969, until May 20, 1969, at the Southeast Louisiana Hospital in Mandeville, with a diagnosis of alcoholism, and hospitalization from April 28, 1971, to May 9, 1971, at the Riverside Medical Center in Franklinton, under the care of Dr. G. L. Foret, again for acute alcoholism.
On March 7, 1972, Mr. Watson consulted Dr. W. P. Crooks, complaining of an approximate twenty-pound weight loss over a two-month period and hesitancy or difficulty in urination. Dr. Crooks' diagnosis was prostatitis and a weight loss of undetermined etiology. Mr. Watson was advised to return in three weeks for a follow-up examination. Before the three-week period elapsed, Mr. Watson returned to Dr. Crooks with similar complaints on March 20, 1972, and was admitted to Bogalusa Community Medical Center to evaluate the reason for his prior weight loss and pyuria (pus in the urine). Mr. Watson was hospitalized from March 20, 1972, until March 24, 1972, during which time diagnostic tests were run. At the time of his discharge, the cause of his weight loss was still undetermined. However, according to the testimony of Dr. Crooks, upon discharge Mr. Watson was fully advised by Dr. Crooks that he was experiencing hematuria (blood in the urine), pyuria, mild anemia, and mildly elevated blood pressure. Mr. Watson was advised to reduce his salt intake as a means of controlling the hypertension. Further, he was advised to return for a recheck of his urine because of the hematuria and pyuria.
Mr. Watson consulted Dr. E. B. Scoggin, Dr. Crooks' partner, on April 27, 1972, complaining again of the symptoms of the urinary tract infection: dysuria (difficulty, pain or burning in the discharge of urine), nocturia (excessive urination at night) and hematuria. Dr. Scoggin's examination resulted in the finding that Mr. Watson had a "boggy" or soft prostate gland, and his diagnosis was prostatitis (inflammation of the prostate gland). Mr. Watson was placed on a sulfa preparation and told to return after the medication was finished to recheck his urine. On the following day, April 28, 1972, Mr. Watson returned to Dr. Scoggin stating that he had received a laceration on his lower lip accompanied by a questionable amount of blood loss. The examination at that time revealed a low blood count. He was placed on an iron medication to help the anemia and instructed to return in three weeks for a blood count.
During this period of ill health, on April 21, 1972, Mr. Watson was forced to cease work at Crown-Zellerbach, claiming disability as a result of his ill health which was certified by Dr. Scoggin as prostatitis and cystitis. Mr. Watson never resumed work and was placed on disability retirement on July 1, 1972.
Minnesota Mutual Life Insurance Company relies on LSA-R.S. 22:619(B) for its defense to plaintiff's claim for the proceeds in question. LSA-R.S. 22:619(B) provides:
"B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer. Amended and reenacted Acts 1958, No. 125." *521 In order for the insurer to successfully urge LSA-R.S. 22:619(B) as a defense to recovery of the proceeds by the plaintiff-appellant, it must be proved that material misrepresentations were made fraudulently or with intent to deceive the insurer and that the misrepresentations materially affected the risk assumed by the insurer. Gay v. United Benefit Life Insurance Company, 233 La. 226, 96 So.2d 497 (1957); Reed v. American Casualty Company of Reading Pennsylvania, 317 So.2d 648 (La.App. 1st Cir. 1975), writ refused, 320 So.2d 914 (1975); Parfait v. Minnesota Mutual Life Insurance Company, 311 So.2d 558 (La.App. 4th Cir. 1975), writ refused, 313 So.2d 847 (1975); Knight v. Jefferson Standard Life Insurance Company, 205 So.2d 485 (La.App. 1st Cir. 1967). Thus, the burden of proof is on the insurer to prove, in addition to the falsity of the statement made, the following two elements: (1) materiality and (2) intent to deceive. Stoma v. Prudential Insurance Company of America, 281 So.2d 871 (La. App. 3rd Cir. 1973).

Intent to Deceive
Strict proof of fraud is not required to show the applicant's intent to deceive, because of the inherent difficulties of proving one's intent. The intent to deceive must be determined from the attending circumstances which indicate the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality thereof, or from circumstances which create a reasonable assumption that the insured recognized the materiality of the misrepresentations. Reed v. American Casualty Company of Reading, Pennsylvania, supra; Parfait v. Minnesota Mutual Life Insurance Company, supra; Murphy v. Continental Casualty Company, 269 So.2d 507 (La.App. 1st Cir. 1972).
In response to the inquiries made on the application calling for any prior hospitalization or any consultation with a physician within three years, Mr. Watson listed his hospitalization for disc surgery which indicates that he understood the nature of the information called for by the questions. Mr. Watson was certainly aware of his three prior, undisclosed hospitalizations, the last occurring only four months before the application was completed, and of his numerous consultations with physicians. Thus, the circumstances indicate that Mr. Watson was aware of the falsity of his representations.
Plaintiff suggests that the hospitalizations were unreported because the tests showed no problems. This contention is unsupported by the evidence. According to the testimony of Dr. Crooks, upon discharge Mr. Watson was fully advised of the mild hypertension and the urinary tract infection. Plaintiff's contention that Mr. Watson had experienced minor problems with a urinary tract infection which was being cleared up is also unsupported. In fact, plaintiff in her own testimony acknowledges that during this period she recognized that Mr. Watson's health was deteriorating. Furthermore, only two days before the application was prepared, Mr. Watson consulted Dr. Scoggin complaining of the continued problem with urination.
It is reasonable to assume that Mr. Watson recognized the serious nature of his continuing ill health at the time the application for insurance was made. He made undisclosed visits to his doctors, was taking medication for both his urinary tract problem and his anemia, and he was even forced to terminate his employment one week before making the application for insurance, claiming disability as a result of his illness. Mr. Watson's awareness of his condition and its importance is further illustrated by his medical history that he related to the urologist only three days after the application was completed. Dr. James A. Roberts testified that Mr. Watson related a three-to-four month history of urinary tract problems, anemia, and weight loss, as well as the hospitalization at the Bogalusa Community Medical Center. Therefore, *522 from the attending circumstances, it is evident that Mr. Watson knew of the falsity of his responses in the application and it is reasonable to assume that he recognized the materiality of the misrepresentations.

Materiality
In order for the misrepresentations made by the applicant for insurance to be deemed material, they must have affected the acceptance of the risk by the insurer. LSA-R.S. 22:619(B). It must be shown that knowledge of the facts, if disclosed, would have affected the insurer in determining whether to accept the risk. Radosta v. Prudential Insurance Company of America, 163 So.2d 177 (La.App. 4th Cir. 1964), writ refused, 246 La. 589, 165 So.2d 483 (1964).
The testimony of Russell C. Roepke, Manager of the Group Underwriting Department of Minnesota Mutual, indicates that several of the omitted medical conditions in Mr. Watson's medical history prior to the application would have influenced Minnesota Mutual's acceptance of the risk. The two prior hospitalizations or alcoholism alone would have been a basis for declining the application. Also, the hospitalization of March 20, 1972, at which time a diagnosis of mild hypertension was made, would have been a basis for declining the policy. Further, the unexplained weight loss, the urinary tract infection, or the prostatitis indicated a continuing medical problem for which Mr. Watson was under continuing medical treatment by Drs. Scoggin and Crooks, and if disclosed to the insurer would have been material to the acceptance of the risk.
For the foregoing reasons, as to the Minnesota Mutual policy, we affirm the trial judge's conclusion that material misrepresentations were made which voided the policy.

LIFE INSURANCE COMPANY OF LOUISIANA POLICY
In his written reasons for judgment, the trial judge invalidated both policies in question because of material misrepresentations made by the applicant. This approach fails to accurately distinguish between the two policy applications. No evidence appears in the record as to whether any misrepresentations concerning the applicant's health were made in applying for the credit life policy issued by the Life Insurance Company of Louisiana. The policy application called for no information concerning the health or prior medical history of Mr. Watson. No evidence shows whether such information was verbally elicited or volunteered.
Life Insurance Company of Louisiana seeks to invalidate the policy in question on the basis of the following provisions in the certificate of insurance:
"4. The Insured named * * * must be alive, in sound health, and gainfully employed before the benefits of this certificate may be attached.
"7. The insurance afforded by this certificate does not cover any disability * * * caused by or resulting from: * * * (5) An accident incurred or sickness contracted by the insured debtor prior to the effective date of the certificate issued to him under this policy." (Exhibit D-2, Record, p. 48)
It is not necessary for the Court to consider the validity of the broad "sound health" clause of provision No. 4 as a condition precedent to the effectiveness of the policy. See, Audubon Life Insurance Company v. Lauzervich, 242 So.2d 589 (La.App. 1st Cir. 1970); Fournier v. Gulfco Life Insurance Company, 241 So.2d 287 (La.App. 1st Cir. 1970). But see, Audubon Life Insurance Company v. Lauzervich, supra (Sartain J. concurring); Brasher v. Life Insurance Company of Louisiana, 306 So.2d 321 (La.App. 3rd Cir. 1975), writ refused, 310 So.2d 639 (1975); Ducote v. Life Insurance Company of Louisiana, 245 So.2d 531 (La.App. 3rd Cir. 1971).
The clear language of provision No. 7 can only be interpreted to exclude coverage *523 for any disability resulting from sicknesses contracted before the effective date of the policy. Pearce v. Union Bankers Insurance Company, 259 So.2d 81 (La.App. 1st Cir. 1972). The effective date is indicated on the policy as May 2, 1972. Based on the medical history in the record, including the size of the mass, weight loss, anemia, and the other symptoms appearing prior to the effective date of the policy, Dr. Patrick R. Hunter, Dr. Scoggin and Dr. Crooks testified that in their opinion to a reasonable degree of medical certainty Mr. Watson's cancer causing his death was contracted before the application and effective date of the policy. Therefore, the benefits afforded by the policy did not cover his death resulting from this particular sickness.
For the above reasons, the decision of the trial court is affirmed. Plaintiff is to pay all costs of this appeal.
AFFIRMED.