John R. **OVERTURF**, Plaintiff-Appellant,

v.

**AERO INSURANCE AGENCY, INC.,** et al., Defendants-Appellees.

No. 81–3709
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1982.

Rehearing Denied Nov. 10, 1982.

---

Satterlee, Mestayer & Freeman, A. D. Freeman, New Orleans, La., for plaintiff-appellant.

Pheleps, Dunbar, Marks, Claverie & Sims, Howard Daigle, Jr., New Orleans, La., for Omni & Compass.

Porteous, Toledano, Hainkel & Johnson, Edward J. Brandao, Glenn B. Adams, New Orleans, La., for Aero Ins. Agency, Inc.

Before BROWN, POLITZ and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is a diversity suit based on a contract of insurance. Plaintiff-appellant, John R. Overturf, brought this action to recover hull damage to his Cessna 310 airplane which was involved in an accident while he was pilot. The insurance contract was issued by Omni Aviation Managers, Inc., the underwriter, on behalf of Compass Insurance Company, the carrier, through Aero Insurance Agency, the independent insurance agent. Each entity is a named defendant in this action. At a non-jury trial, plaintiff contended that he had a valid insurance policy on the day of his accident. Defendants dispute this claim by asserting that the policy of insurance on the Cessna 310 was ineffective due to a material misrepresentation made by the plaintiff regarding his pilot status. After a turbulent trial, the District Court granted a judgment in favor of the insurance defendants finding that the contract of insurance was not enforceable by the plaintiff because of his significant misrepresentation regarding his pilot status. We affirm.

## I. Facts: The Tangled Web

### A. (Overturf's Overture)

On October 14, 1977, Overturf contacted an independent insurance agent, Aero, seeking hull and liability coverage for his Cessna 310 multi-engine aircraft.[1] Speaking by telephone to an employee of Aero, Debbie Artigue Dauth, Overturf answered questions concerning his pilot qualifications and other vital statistics required by insurance underwriters (i.e., name, age, amount of coverage desired, etc.). At the completion of the phone conversation, Aero's employee recorded Overturf's pilot status as "PVT", meaning that he held a private pilot's certificate issued by the Federal Aviation Administration; that he held "SEL" and "MEL" ratings, meaning that he was authorized to pilot both single and multi-engine aircraft, respectively; and that he had logged at least 1800 hours flying time in various aircraft.

Following this inquiry, Dauth then proceeded to inquire about insurance rates from various insurance companies. Omni, insurance underwriter for Compass, quoted more favorable insurance rates than others. The Fates proved kind to Overturf. That same day Aero issued an aviation binder to him since Omni had agreed to assume the risk of insuring the Cessna 310. Within two weeks, October 31, 1977, pursuant to Aero's request, Overturf made an installment payment on the insurance coverage.

The grapes went sour thereafter; the Fates unkind. The next day, November 1, 1977, the Cessna 310, Overturf's magnificent flying machine, did not prove to be so magnificent. The weather was clear. The wind was calm. But the landing gear was stuck. Overturf was forced to make a crash landing without human injury. Damage to the plane was substantial.

### B. Overturf's Oversight Discovered

Considering himself lucky to have secured insurance two weeks before and to have made the initial premium payment one day before the accident, Overturf made a claim against the insurance policy. But here, the plot thickens. It was discovered that Aero had not yet received a signed application for insurance from Overturf. What is more, an insurance adjuster, Hugh Mason, representing Omni, the underwriter, began conducting a routine investigation of the accident and discovered that Overturf apparently spoketh to Dauth with forky tongue regarding his pilot status. Overturf, at the time his accident occurred, November 1, 1977, had only been certified by the FAA to fly the friendly skies as a student pilot in single engine aircraft. That day or any days prior to it, he had earned his wings to fly neither as a private pilot nor in multi-engine aircraft. Dauth maintains that she received this information to put on the boilerplate form from the pilot's mouth. Overturf claims he was never asked what type pilot's license he possessed and that the certificate and ratings notations were put there by Dauth erroneously apparently upon her own volition.

The insurance defendants contend that since Overturf misrepresented his pilot status intentionally, they are not required to make good on the insurance policy. They further maintain that had Overturf honestly disclosed his pilot status when applying for hull and liability coverage, they would not have extended insurance coverage to his aircraft at all.

### C. Just One Look, That's All It Took

Overturf, on the other hand, maintains that he made no misrepresentation to the insurance agent whatsoever. He claims never to have concealed his flight status from anyone, least of all the insurance agent. He points out that a person's pilot status is a matter of public record, and under those circumstances, he certainly cannot be accused of deliberate deception. Overturf further insists that had the defend-

---

1. Overturf also sought insurance on another aircraft, a Cessna 172 single engine plane. He obtained coverage for the aircraft, but it was not to become effective until the expiration of the insurance policy under which it was then currently covered. Neither the Cessna 172 nor its insurance coverage is in any way involved in this dispute.

ants shown as much investigative initiative before the accident occurred as they did after the accident, they would have been able to check his pilot's status. Ostensibly, he asserts the peculiar view that it did not require much for the insurance defendants to confirm his pilot status, and since they failed to peep, it is their error, not his.

## II. Louisiana Law: Untangling The Tangled Web

### A. Who's Liable? What Does the Law Say?

■ Louisiana insurance law governs this case. The pivotal issue in this case is whether the plaintiff misrepresented his qualifications to the insurance defendants. We must therefore turn to that part of the Louisiana Insurance Code which applies, La. Rev.Stat.Ann. § 22:619(A).[2] As the District Court observed and numerous Louisiana decisions have mentioned,[3] La.Rev.Stat. Ann. § 22:619 is an "anti-technical" statute designed to protect plaintiffs from overly harsh insurance contract provisions. The essence of the portion of the statute rele-

vant here is that a misrepresentation made in the negotiation of an insurance contract is only material if it is made with an intent to deceive. Under Louisiana law, "material," in this context, "means that the statement must have been of the nature that, had it been true, the insurer would not have contracted or would have contracted only at a higher premium rate." *Martin v. Security Industrial Insurance Co.*, 367 So.2d at 422, *supra*, note 2. Under this standard, we cannot hold the District Court to have been clearly erroneous in concluding that Overturf's misrepresentation was of such a nature as to preclude recovery under the insurance contract.

### B. Whose Mistake? Not Mine. Well, Maybe. But ...

■ Overturf phoned Aero to get rate information for insurance on his Cessna 310 multi-engine plane. Aero's employee knew nothing about him or his qualifications. As a matter of routine for the nearly two years that she had been on the job, Dauth asked the unfamiliar voice on the other end of the

**2.** La.Rev.Stat.Ann. § 22:619 provides:

A. Except as provided in Sub-section B of this Section and R.S. 22:692, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.

B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.

The plaintiff is of the view that § 22:619(B) is applicable. That section imposes a more substantial burden of proof on the defendants than does section (A). The District Court was apparently persuaded by this view because it applied the section (B) standard. On its face, however, § 22:619(B) applies only to life or health and accident insurance. Section 22:619(A) applies to other kinds of insurance, such as automobile insurance and other types of property insurance. The Supreme Court of Louisiana has implicitly recognized as much in

analyzing various kinds of insurance contract disputes. In *Benton Casing Service, Inc. v. Avemco Insurance Co.*, 379 So.2d 225 (La. 1979), for example, a case where the insured was seeking to recover damages for the loss of a company airplane, the Supreme Court of Louisiana reached its result by applying section (A) analysis. *See also Cousin v. Page*, 372 So.2d 1231 (La.1979), and *DiGeralomo v. Liberty Mutual Insurance Co.*, 364 So.2d 939 (La.1978).

Conversely, many of the cases applying section (B) analysis have dealt with life or health insurance. *See Borer v. Louisiana Health Service Indemnity Co.*, 398 So.2d 1124 (La.1981); *Topps v. Universal Life Insurance Co.*, 396 So.2d 394 (1981); *Ryan v. Security Industrial Insurance Co.*, 386 So.2d 939 (1981); *Martin v. Security Industrial Insurance Co.*, 367 So.2d 420 (1979); *Watson v. Louisiana Life Insurance Co. of Louisiana*, 335 So.2d 518 (1976).

Even with application of the heavier burden of proof on the insurance defendants in the case at bar, the plaintiff did not prevail in the District Court and he could not prevail here. The District Court's finding of material misrepresentation is amply supported by the record; hence, we see no reason to disturb that finding on appeal.

**3.** See cases cited in note 2 *supra*.

telephone questions taken directly from the boilerplate insurance application. In trying to pass the buck regarding who is responsible for the error on his application, Overturf tries to make his case similar to *Ryan, supra*, note 2 where the insurer's agent made a mistake in filling out the insured's life and burial insurance application. In *Ryan*, the insured was paralyzed from the waist down when her application for insurance was completed. She died within three months after the life insurance policy was issued. The insurance company resisted liability on the basis that the insured made material misrepresentations regarding the status of her health. The facts revealed that the insurance agent had come to the house of the insured to fill out the application where there were two witnesses present. Although the insurance application contained inaccurate information about the health of the insured, this error was shown to be that of the insurance agent who "falsely" filled "out the application." *Id.* at 941. There was corroborating testimony from two witnesses to the effect that the insured had disclosed the relevant information and made no misrepresentations. The insurance agent in that case never came forth to rebut that testimony.

Not this case. There were no witnesses, save Overturf himself, produced to corroborate Overturf's testimony that he did not intend to deceive the insurance agent. The agent came to testify as to the information she received. Overturf's introduction into evidence of a copy of the original, allegedly "lost", application shows that he typed in "student" above the "Ratings Held" column of the application. The lost application, itself not a clear indication of Overturf's true pilot status, was unheard of until the initiation of litigation. Every other portion of the insurance application was accurate with the exception of Overturf's pilot status and ratings. So if any misinformation was received, it is reasonable to assume that Overturf imparted it. But misinformation alone does not render coverage on the Cessna 310 ineffective under the Louisiana statute. It is the plaintiff's *state of mind* which matters. That is to say, the issue is whether or not the plaintiff had an *intent* to deceive the insurance company when he made the misstatement.

### C. Le Denouement

■ We recognize, of course, that no court can properly lay claim to being possessed of expert psychoanalytic ability. The District Court is not a hypnotist and we are not quite so gifted enough to do *post hoc* mind reading on the plaintiff. One need not do so, one need only pay attention to surrounding circumstances which may indicate a person's intent. E.g. *Watson v. Life Insurance Company*, 335 So.2d at 521, note 2, *supra*. When studying the facts in this case, the District Court found that Overturf had the requisite intent to deceive. Overturf's previous insurance policy was not renewed by another carrier because he did not have a private pilot's license. The Judge could conclude that were he to inform the independent insurance agent of his pilot's status it might sound the death knell for insurance on his planes, which would work a hardship on him and his business.

Still, Overturf claims to have returned the insurance application to Aero with his correct flight status recorded. Aero claims never to have received it and their claim is borne out by the fact that in subsequent communications—post-accident and pre-knowledge of his true pilot status—they continued to request his application. Not only did Overturf have knowledge that Aero did not have the application, but he never even called to Aero's attention the information concerning his flight status. He did not mention his pilot status until he wrote a letter to the adjuster, Hugh Mason, on November 28, 1977. This letter came *after* repeated requests for his signed insurance application and *after* notice of "suspension" of his insurance coverage by the agent on November 25, 1977. From Overturf's foot-dragging in this respect, the Court could reasonably find that he had the

requisite *mens* to deceive the insurance company.[4]

### D. Who Cares About Pilot Status Anyway?

■ But even though Overturf had an intent to deceive, and we concur in that finding by the District Court, there must still be a showing that the misrepresentation was "material" (i.e., that it *mattered* or made a difference in what the insurance company would have done with regard to assuming the risk of insuring the aircraft). It would defy reason and good business judgment to seriously suggest that an insurance company would deem the pilot status of a person who wished to insure his aircraft "immaterial". A glance at the face of the insurance application shows that this could not be so. The flying experience of the insured applicant is sought in detail. The insurance underwriter wants to know what kind of certificate the applicant had, what ratings does he hold, how many hours logged, and in what kind of plane had they been logged. It would be peculiar indeed if this information were considered "immaterial" to an insurance company trying to determine whether or not it wants to assume the risk of insuring the aircraft. This is most assuredly true when such high financial stakes are involved. Here, Overturf's liability coverage was $1,000,000 and his annual premium was nearly $1,000. Given these facts, we cannot seriously entertain the idea that a pilot's flying status would be "immaterial" to an insurance company.

Finally, FAA regulations do not permit a person with only student certification to solo pilot a multi-engine plane on a flight for business purposes. *See* Aeronautics and Space, 14 C.F.R. § 61.89 (1982).[5] Overturf indicated that the plane would be subject to such use. Therefore, it is clear that Overturf would not have been able to get insurance without exclusionary conditions of some sort. Moreover, the insurance company defendants testified that they would not have extended coverage to the aircraft had they known that Overturf was only a student pilot with only a single engine rating. Student certification and private certification portend distinctly different levels of expertise and competence in flying an aircraft. *See* 14 C.F.R. § 61.103 (eligibility requirements for private certification). Although there is no evidence in this record that the crash Overturf was involved in was due to pilot error—and we intimate no such suggestion here—it is neither an unfair nor unreasonable industry judgment that safety and expertise in aircraft handling are more likely to come from those flyers who have passed the rank of student pilot.

### E. Constructive Estoppel? ... 'Er, 'fraid Not.

■ Overturf also asserts on appeal that regardless of his misrepresentation to the insurance agent, the failure of the underwriter and carrier to rescind and cancel the insurance policy when they discovered the misrepresentation estops them from denying coverage. The facts indicate that the insurer defendants were not aware of Overturf's pilot status until late November. The accident occurred the first day of November. They received the awareness of his student pilot status through no effort of the plaintiff, but rather through a third party doing an investigation of the accident to determine the amount of damages to the aircraft. Under these circumstances, the

---

4. We are aware that much of these facts occurred after the plane accident on November 1, 1977. However, these facts are relevant to a determination as to whether Overturf's original misrepresentation on October 14, 1977, was simply an oversight or a deliberate misstatement. From a general reading of these facts, the District Court could properly find that the misrepresentation on October 14, 1977 was not in good faith and subsequent acts proved Overturf's intent to deceive.

5. 14 C.F.R. § 61.89 (1982) provides in pertinent part—

General Limitations.
(a) A student pilot may not act as pilot in command of an aircraft—

 \*   \*   \*   \*   \*   \*

 (4) In furtherance of a business;

 \*   \*   \*   \*   \*   \*

insurer cannot now be told that it is estopped from asserting a valid defense—fraud.

### Encore in Brief

Because the District Court could conclude that the plaintiff knew that his pilot status was relevant to his obtaining needed insurance; that he was well aware of the misrepresentation he made to the insurance company; that an insurance company in its sound business judgment would not ignore the pilot status of a pilot-applicant for aircraft insurance; its findings were clearly supportable and its judgment correct.

AFFIRMED.