**BANK OF WINNFIELD & TRUST CO.**

v.

**UNITED STATES of America.**

**Civ. A. No. 79–0481.**

United States District Court,
W. D. Louisiana,
Alexandria Division.

Feb. 25, 1982.

Kermit M. Simmons, Simmons & Derr, Winnfield, La., for plaintiff.

J. Ransdell Keene, U. S. Atty., Frances O. Allen, Asst. U. S. Atty., Shreveport, La., for defendant.

## RULING ON MOTION

NAUMAN S. SCOTT, Chief Judge.

This case is before us on a motion and cross-motion for summary judgment. The facts are undisputed and are basically as follows:

(1) Bank of Winnfield, during the 1973 and 1974 tax years, followed the policy of making credit life insurance available to its customers;

(2) The opportunity to purchase such a policy was explained to the customer by a loan officer of the bank at the time the loan was made;

(3) If the customer chose to purchase the insurance, the premium was calculated by the bank officer and added to the loan;[1]

(4) The amount of the premium was deposited in a checking account maintained by Black Cat Corporation at the Bank of Winnfield;

(5) Black Cat Corporation had four shareholders with twenty-five (25%) percent interest each, who also owned a controlling interest in the Bank of Winnfield.

(6) Forty (40%) percent of the premium was transferred by Black Cat Corporation to the insurance company writing the policy and the remainder was paid equally to the four shareholders of Black Cat Corporation. The shareholders reported the premium income in their gross income for the years in

question and paid the taxes due thereupon;[2]

(7) The only registered life insurance agent in either the bank or Black Cat was Richard C. Heard, President of the Bank of Winnfield and Secretary-Treasurer of Black Cat Corporation who took no part in soliciting insurance from individual customers;

(8) The credit life insurance provides important collateral for the bank and is an important service to the customers and the cost of providing the service is negligible; and

(9) The bank has never taken life insurance commissions into its income for tax purposes.

The question before us is whether the income produced from the sale of this credit life insurance is properly taxable to the bank.

In *Comm. of Internal Revenue v. First Security Bank of Utah*, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), which involved an effort by the Commissioner to allocate income to the bank under 26 U.S.C. § 482, the facts were virtually identical to those presented here. The Court noted that federal law prohibited the bank from selling insurance and refused to hold that the income from the insurance sales could be allocated to the bank for tax purposes stating:

"We know of no decision of this Court wherein a person has been found to have taxable income that he did not receive and that he was prohibited from receiving."

405 U.S. at 403, 92 S.Ct. at 1091, 31 L.Ed.2d at 326. The court rejected the assignment-of-income doctrine because it assumes that the income would have been received by the taxpayer had he not arranged for it to be paid to another whereas in the case before the Court the bank was prohibited by law

---

1. Car loans were handled somewhat differently by the plaintiff. A bank employee did not compute the monthly premium for such insurance in determining the total payment for an auto loan. The bank secured the information from someone else if the customer requested

and, if requested, included the premium in the monthly note.

2. Black Cat Corporation has elected to be treated under Subchapter S of the Internal Revenue Code.

from receiving the income in the first place.[3]

If the Bank of Winnfield was prohibited by State law from engaging in the insurance business or receiving commissions, the factual setting as presented to us in the instant case would not be sufficiently distinguishable from the *First Security* case to permit a different conclusion.

LSA–R.S. 6:237 provided during the 1973 and 1974 tax years:[4]

"Banking associations have the following powers *and no others* : To receive deposits; to lend money on real and personal security; to accept for payment at a future date drafts drawn upon them by their customers; and to issue letters of credit authorizing the holders of them to draw drafts upon them or their correspondence at sight or on time; to discount and buy and sell promissory notes and build the exchange, and other evidence of indebtedness, gold and silver and bonds of the United States of America, and of this state, and of the several levee districts of this state and of the parishes and school districts, drainage districts, road districts, and other municipal corporations of this state, on which bonds there shall have been no default and the payment of interest for the five years preceding the acquisition of the bonds by the bank. . . . Banking associations having a capital of 20–5 thousand dollars or more, as provided for in R.S. 6:234 may receive saving deposits; they may contract with the depositors for the privilege of sixty days notice of intention to withdraw and they may hold such immovable property as may be provided for in this Chapter." (emphasis added).

Since selling insurance or receiving commissions or any benefits of that nature from the sale of insurance are not listed in the powers of a banking association organized under Louisiana law, the Bank of Winnfield was prohibited from receiving the commissions in question.

Repeal of prior law by implication is not favored in Louisiana, *Smith v. Crown-Zellerbach, Inc.*, 638 F.2d 883 (5th Cir. 1981). Consequently, the Louisiana Consumer Credit Act, LSA-R.S. 9:3510 et seq., which became effective January 1, 1973 and allowed creditors to sell credit insurance, did not have the collateral effect of enlarging the powers of banks under LSA–R.S. 6:237, supra.

Nothing the defendant has cited[5] convinces us that the Consumer Credit Law was meant to overrule the Louisiana Banking law as it existed in 1973 and 1974 which prohibited a banking association from selling credit life insurance or receiving the commissions therefrom.[6]

In *Salyersville National Bank v. United States of America*, 613 F.2d 650 (6th

---

3. See the Court's discussion at 405 U.S. at 403–05, 92 S.Ct. at 1091–92, 31 L.Ed.2d at 326–27.

4. Defendants urge the Court to use LSA–R.S. 6:237 as amended in 1976. However, the statute as amended did not govern the legality of the bank's activities in 1973 and 1974 which are the years in question here.

5. In *Brasher v. Life Ins. Co. of Louisiana*, 306 So.2d 321 (La.App., 3rd Cir., *cert. denied*, April 11, 1975, a widow of a debtor of the bank filed suit against the insuror to recover death benefits under two alleged credit life policies or, alternatively, to recover the face amount of the policies from the bank and its employees. The court allowed recovery against the bank because its employee was acting as an agent of the debtor to procure insurance and had failed to do so. The liability was in no way based upon the fact that the bank acted as an "agent" of the insurance company. In *Butler v. Vulcan Life & Accident Ins. Co.*, 179 So.2d 642 (La. App., 2nd Cir. 1965), the court used language suggesting that the bank was acting as an agent for the insurance company. However, the use of the word "agent" was not in the sense of a seller-agent but was used to indicate that the bank was the agent of the insurance company for purposes of issuing certificates of insurance. Neither of these cases convince this court that the Louisiana courts have indicated that it is legal for banks to sell insurance and receive commission income.

6. See *Commissioner v. First Security Bank of Utah*, 405 U.S. 394 at 402, n. 16, 92 S.Ct. 1085 at 1090, n. 16, 31 L.Ed. 318 at 325–26, n. 16 wherein the court discusses differences between "making available" insurance and "selling" insurance.

Cir. 1980), the taxpayer contended the commissions attributed to it were never received by it and the taxpayer was not a licensed agent which could legally receive such commissions. The court discussed the interpretation of the Kentucky statutes concerning the legality of a bank being a licensed insurance agent. However, the court pretermitted that question as the record revealed that the taxpayer bank was not a licensed insurance agent pursuant to Kentucky law. The Kentucky law prohibited the payment of premium commissions to ones other than licensed agents. Louisiana law (La.R.S. 22:1113) likewise prohibits a licensed agent from paying a commission or other consideration to any person who is not a licensed agent. In *Salyersville* the court stated:

"The Commissioner appears to take the position that the taxpayer bank had a duty to qualify as an insurance agent so that it could have legally received the income the Commissioner attempts to allocate to it. It points to no authority for that proposition. Rather the courts have stated that a taxpayer need not structure its business to maximize taxes.... So here, the fact that taxpayer may have had the power to enable it to receive the income legally does not require that it exercise that power. Unless it did so, receipt of the income would have been illegal.

"Since we are of the opinion that the taxpayer bank could not legally receive the credit life insurance commissions, plaintiff was entitled to summary judgment as a matter of law." 613 F.2d at 655–56.

Therefore, even if Louisiana law then allowed a bank to be an insurance agent, the record reflects that the Bank of Winnfield & Trust Company never qualified as such and was thus not entitled to receive legally any commissions from the sale of any insurance.

The Motion for Summary Judgment on behalf of the plaintiff herein is hereby granted, and the Motion for Summary Judgment on behalf of the defendant herein is hereby denied. Bank of Winnfield &

Trust Company is requested to submit a judgment in accordance with the preceding within ten days.