## THE PROCTER & GAMBLE COMPANY, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16521-84. Filed September 18, 1990.

*William S. Corey, J.D. Fleming, Jr., Burgess L. Doan, Mac Asbill, Jr., T. Paul Freeland,* and *Harold W. Walker,* for the petitioner.[1]

*Robert J. Kastl* and *Ann J. Davidson,* for the respondent.

HAMBLEN, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax in the amounts and for the years as follows:

| TYE | Deficiency |
| --- | --- |
| June 30, 1978 | $765,649.04 |
| June 30, 1979 | 1,188,033.02 |

The issue for decision in this case is whether respondent's allocations of gross income from Procter & Gamble Espana, S.A., to Procter & Gamble A.G., pursuant to section 482,[2] were arbitrary, capricious, or unreasonable.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation and exhibits attached thereto are incorporated herein by this reference.

---

[1] T. Paul Freeland and Harold W. Walker are now deceased.

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as in effect for the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.

Procter & Gamble Company (petitioner or P&G) is an Ohio corporation whose principal place of business at the time of the filing of the petition herein was in Cincinnati, Ohio. During the years in issue, petitioner maintained its books and records on the accrual method of accounting with taxable years ending on June 30. Petitioner timely filed its Federal income tax returns for 1978 and 1979 with the Internal Revenue Service Center at Cincinnati, Ohio. At all times relevant to the issues in this case, petitioner was principally engaged in the business of manufacturing and marketing consumer and industrial products. Petitioner operated its business both directly and indirectly through domestic and foreign subsidiaries and affiliates.

Procter & Gamble A.G. (AG) is a Swiss corporation and at all relevant times was a wholly owned subsidiary of petitioner. During each of the years in issue, AG was engaged in the marketing of petitioner's products, generally in those countries in which petitioner did not have a marketing subsidiary or affiliate.

During the years in issue, petitioner and AG were parties to a License and Services Agreement, known as a "package fee agreement," under which AG paid royalties to petitioner for the nonexclusive use by AG and its subsidiaries of petitioner's patents, trademarks, tradenames, knowledge, research, and assistance in the fields of manufacturing, general administration, finance, buying, marketing, and distribution. Petitioner executed similar agreements with its other directly owned foreign subsidiaries during the years in issue. The royalty amounts paid by AG to petitioner were based principally on net sales of petitioner's products by AG and its subsidiaries, and certain other companies in Greece, Spain, Austria, Saudi Arabia, Morocco, Iran, Libya, and Lebanon. During the years in issue, AG executed technical assistance and other service agreements, similar to package fee agreements, with its directly owned active subsidiaries.

In 1967, petitioner made preparations to organize a wholly owned subsidiary in Spain to manufacture and sell its consumer and industrial products in that country. At that time, many laws, decrees, and orders were in effect in Spain regulating foreign investment in Spanish companies

and limiting the payment or assignment of credits in pesetas in favor of residents of foreign countries.

Article First, paragraphs 14 through 17, of the First Title of the Spanish Law of Monetary Crimes of November 24, 1938 (Law of Monetary Crimes), in effect through 1979, provided broad authority for the regulation of payments from Spanish entities to residents of foreign countries. These provisions required governmental authorization prior to the making of payments or assignment of credits in pesetas in favor of residents of foreign countries. The making of such payments without governmental authorization constituted a crime. The Law of Monetary Crimes was repealed and restated by Law 40/1979 of December 10, 1979.

Decree 16/1959 of July 27, 1959, contained specific regulations concerning investment of foreign capital in corporations organized in Spain. Article 4 of Decree 16 classified investment of foreign capital based on whether the particular business was of "preferential economical and social interest." Article 4 provided, inter alia, that a foreign investment could be deemed preferential if directed towards the modernization or enlargement of existing plants. If the foreign investment was found to be of preferential economic interest, Article 6 provided that the company would have the "right to transfer abroad in foreign currency and— without any quantitative limitation, the benefits actually obtained by the foreign capital." Article 5 required prior authorization from the Spanish Council of Ministers in order for foreign participation to exceed 50 percent ownership of the capital of a Spanish corporation.

On September 23, 1967, P&G, upon the advice of competent Spanish counsel, submitted an application letter addressed to the "Presidency of the Spanish Government" requesting authorization to organize a Spanish company, Espana. The application recited that P&G intended to own directly, or through a wholly owned subsidiary, 100 percent of the capital stock of Espana. The application stated that Espana would have as its purpose the manufacture and sale of high quality consumer and industrial products, including synthetic detergents, soaps and toiletries, and other cleaning and washing products.

In an index attached to the application letter, P&G stated that Espana would employ up to 250 persons for its manufacturing operations and that an additional 120 persons could be employed if P&G were to construct a new synthetic detergent factory. However, P&G indicated that it might purchase an existing plant if one could be found meeting its technical specifications.

Paragraph 8 of the index set forth estimated annual requirements for foreign currency for the first 5 years of Espana's existence. Among the items covered was an annual amount of 7,425,000 pesetas necessary for royalty and technical assistance payments.

The final portion of the index related to P&G's justification for its desire to hold over 50 percent of the capital of Espana. P&G stated that its 100 percent ownership of Espana would allow Espana immediate access to additional foreign investment. Further, P&G indicated that it was in the best position to shoulder the formidable risks associated with mass-produced consumer products, and that 100 percent ownership of Espana would allow P&G to preserve the confidentiality of its technology.

The Spanish Government approved P&G's application for a 100 percent interest in Espana by a letter dated January 27, 1968. However, the letter expressly provided that Espana could not pay any amounts for royalties or technical assistance. After receipt of the letter, P&G's Spanish counsel advised that the limitation on royalty payments was within the power of the Spanish Government and reflected normal practice. Counsel further advised that there was no realistic possibility of appealing or protesting the decision as long as P&G intended to retain 100 percent ownership of Espana. Consistent with advice of counsel, P&G did not formally appeal the prohibition on royalty payments. At the time of its organization, Espana had several competitors in Spain who likewise could not make royalty payments abroad.

For reasons not clear in the record, a determination was made that AG, rather than P&G, would hold the entire interest in Espana. Espana's Deed of Incorporation was registered in the Mercantile Registry of the Province of Madrid on May 29, 1968.

From 1969 through the years in issue, Espana filed several applications with the Spanish Government seeking to increase its capital from the 120 million pesetas originally approved. The first application, filed on October 23, 1969, and approved on January 30, 1970, sought a capital increase of 70 million pesetas due to an expanding work force, the establishment of a laboratory in Madrid for quality control testing, and upcoming fixed asset costs. The letter granting Espana's request stated that Espana "will not pay any amount whatsoever in the concept of fees, patents, royalties and/or technical assistance to the investing firm nor to any of its affiliates, unless with the approval of the Administration." Additional applications for capital increases were filed in 1970, 1971, 1975, 1977, and 1978. While the application filed in 1970 was denied, the remaining applications were approved subject to essentially the same prohibition against the payment of royalties as appeared in the first approval for capital increase. Counsel for Espana and an official from the Spanish Ministry of Industry met on May 19, 1970, to discuss the possibility of Espana's making technical assistance payments to AG. However, the Spanish Government would not approve or grant permission for such payments. To the contrary, such applications or appeals were discouraged by the Spanish Government due to concerns that similarly situated companies would abuse technical assistance payments to remove profits from Spain untaxed. On the other hand, this policy was not imposed as to companies with a majority of foreign capital where a clear and obvious benefit to Spain was demonstrated in terms of substantial exports, use of Spanish raw materials, and enhancement of Spanish technology.

On September 21, 1973, the Spanish Government issued Decree 2343/1973, which provided specific regulation of technology agreements. Article 3 of Decree 2343 required that application for the recording of technology agreements on a register created within the Ministry of Industry be made for all technology agreements between individuals or legal entities resident, domiciled, or legally established in Spain and individuals or legal entities resident, domiciled, or legally established abroad. Under Article 5 of Decree 2343, the Ministry of Industry was given the discretion, along

with other departments of the Spanish Government, to refuse to register technology agreements deemed abusive. Recording of the technology agreement by the Ministry of Industry was a necessary prerequisite under Article 6 for an authorization by the Ministry of Commerce for transfers abroad of foreign currency under the technology agreement.

On December 5, 1973, the Ministry of Industry issued an order providing detailed rules for the recording of technology agreements under Decree 2343. Paragraph 12 of Article 3 of the order provided that for purposes of Article 5 of Decree 2343, the Ministry of Industry (or other Ministry having jurisdiction) shall consider as unfavorable a provision within a technology agreement imposing royalty payments based upon the technology recipient's level of activity, where the recipient is a subsidiary of the assignor and the latter holds more than 50 percent of its capital. The order did not expressly limit the payment of royalties where foreign investment in the Spanish corporation was less than 50 percent. Authorization for payment of royalties was easily obtained by a Spanish corporation in which the foreign investment was less than 50 percent.

Shortly thereafter, Decree 16/1959, discussed above, was repealed following the approval of Decrees 3021/1974 and 3022/1974 on October 31, 1974. However, Article 5.1 of Decree 3021 retained the requirement that prior administrative authorization be obtained from the Council of Ministers where foreign investment is to exceed 50 percent of the capital stock of a Spanish corporation. Article 5.2 of Decree 3021 provided that once administrative authorization is obtained in accordance with the provisions of that Article, prior authorization would again be required for any amendment of the stated purpose, an increase in capital, or any increment in the percentage of foreign participation authorized, as well as for the modification of any condition which the previous administrative authorization may have imposed. Decrees 3021 and 3022 provided for appeals from the administrative acts authorized by the regulations.

In 1973, P&G entered into an engineering services contract with Espana in connection with the expansion of an Espana factory in Mataro, Spain. To gain approval to pay P&G for its actual costs under the contract, Espana

requested and obtained a clarification from the Spanish Foreign Investments Office that payments for specific services were not intended to fall within the purview of the prohibition against royalty and technical assistance payments. In 1974, after satisfying the concerns of the Ministry of Industry that the engineering services P&G would provide Espana could not be provided by a Spanish company, payments under the contract to P&G were approved.

In 1976, in response to depressed economic conditions, Spain adopted measures designed to facilitate and promote foreign investment in the Spanish market. In this regard, Decree 3099/1976 of November 26, 1976, supplemented Decree 3021 by providing general and automatic authorization for investments carried out in compliance with certain requirements. Articles First, Second, and Third of Decree 3099 authorized direct foreign investment in excess of 50 percent of the capital Spanish corporation either at the time of its organization, by capital increase, or by acquisition of shares, provided that requirements relating to the source of funds, size of the initial capital contribution or capital increase, number of employees, foreign exchange position, and/or percentage of exports were satisfied. Such general authorizations were expressly conditioned on the Spanish company's making no payments to the foreign investor, its subsidiaries, or its affiliates for the transfer of technology. Article Fourth, paragraph 1, of Decree 3099 referred to Article 5.2 of Decree 3021 and provided that Spanish companies having foreign participation in their capital by virtue of prior individual administrative authorizations were authorized to carry out increases in capital providing the existing percentage of foreign capital was not increased. Paragraph two of Article Fourth authorized increases in capital for companies formed in accordance with the provisions of Articles First, Second, and Third subject to the same conditions contained in those Articles.

In 1977, Espana was again permitted to make payments to P&G for actual costs arising under a second engineering services contract for further expansion of the Mataro plant. Payment was approved when it was reduced from $500,000 to $148,905. Finally, engineering services payments were

approved from Espana to a Belgian affiliate of P&G in October 1977, for a further expansion of the Mataro plant and the construction of a new manufacturing plant in Cordoba, Spain.

Espana informally approached Spanish officials regarding Espana's payment of a "package fee" again in 1978. At that time, an Espana employee wrote to P&G's affiliate in Belgium and advised that while it was unlikely that Espana could make payments based on a percentage of its sales, it might be possible for Espana to make regular payments to the Belgian affiliate for actual costs associated with research and development and engineering services to the extent that Espana could document receipt and use of the technology.

Although the officers of P&G, AG, and Espana discussed the payment of royalties with their counsel from the time of Espana's organization through the years in issue, informal discussions with Spanish officials dissuaded a formal appeal and Espana never formally applied for a reversal of the prohibition. Contrary to normal practice, AG did not have any agreement with Espana during the years in issue under which Espana made any payment, or was required to make any payment, to AG for the use of P&G's technology. However, during the years in issue, AG paid a royalty to P&G which was based in part on a percentage of Espana's sales; these royalty payments reduced AG's income.

Consistent with its membership in the European Economic Community, Spain liberalized and streamlined its system of authorization for foreign investments by Decree 1042/1985 of March 29, 1985. In light of these changes, Espana filed an application for removal of the prohibition against royalty payments on October 30, 1986. By letter dated May 7, 1987, Espana's application was approved. Espana's subsequent application for authorization to pay package fees retroactive to July 1, 1987, was likewise approved.

Among other adjustments contained in the statutory notice of deficiency, respondent determined that income should be allocated in the amounts of $1,232,653 and $1,795,005 for the years 1978 and 1979 respectively, from Espana to AG, pursuant to section 482, in order to clearly

reflect AG's income. These allocations in turn increased petitioner's subpart F income under section 951(a)(1)(A).

Respondent's determination is based on a royalty of 2 percent of Espana's net sales of petitioner's products for the taxable years in question. For purposes of this litigation, petitioner does not contest the amount of the allocation made by respondent or the use of 2 percent in calculating that determination, but contends that no allocation from Espana is proper under section 482. Thus, after concessions, the sole issue for decision is whether respondent's allocations of gross income from Procter & Gamble Espana, S.A., to Procter & Gamble A.G., pursuant to section 482, were arbitrary, capricious, or unreasonable.

## OPINION

Section 482, as in effect for the years in issue, provided as follows:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The term "controlled" is broadly defined in section 1.482-1(a)(3), Income Tax Regs., which provides:

The term "controlled" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

Section 482 authorizes respondent to allocate income between controlled enterprises if he determines that such an allocation is necessary to prevent evasion of taxes or clearly to reflect the true income of the controlled enterprises. For a thorough discussion of the origin and evolution of section 482 see *G.D. Searle & Co. v. Commissioner,* 88 T.C. 252, 356-357 (1987), and *Eli Lilly & Co. v. Commissioner,* 84 T.C. 996, 1114-1115 (1985), affd. in part, revd. in part, and

remanded 856 F.2d 855 (7th Cir. 1988). It is sufficient for purposes of this opinion to emphasize that section 482 is designed to prevent the artificial shifting of the true net incomes of controlled taxpayers by placing controlled taxpayers on a parity with uncontrolled, unrelated taxpayers. *Commissioner v. First Security Bank of Utah*, 405 U.S. 394, 400 (1972); *Simon J. Murphy Co. v. Commissioner*, 231 F.2d 639, 644 (6th Cir. 1956); *Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. 525, 581 (1989).

It is well established that respondent's authority to make allocations under section 482 is broad and that respondent's section 482 determination must be sustained absent a showing that he has abused his discretion. *Bausch & Lomb, Inc. v. Commissioner*, 92 T.C. at 581-582, and cases cited therein. Thus, in order for this Court to redetermine the deficiency, the taxpayer must meet a heavier than normal burden of proof and demonstrate that respondent's determinations are arbitrary, capricious, or unreasonable. *Foster v. Commissioner*, 756 F.2d 1430, 1432 (9th Cir. 1985), cert. denied 474 U.S. 1055 (1986); *Spicer Theatre, Inc. v. Commissioner*, 346 F.2d 704, 706 (6th Cir. 1965); *G.D. Searle & Co. v. Commissioner*, 88 T.C. at 358; *Paccar, Inc. v. Commissioner*, 85 T.C. 754, 787 (1985), affd. 849 F.2d 393 (9th Cir. 1988). Whether respondent has exceeded his discretion turns upon questions of fact. *American Terrazzo Strip Co. v. Commissioner*, 56 T.C. 961, 971 (1971).

Petitioner asserts that because Spanish law prohibited or blocked royalty payments from Espana to AG, petitioner did not improperly utilize its control to shift income, and thus section 482 does not apply. In this regard, petitioner relies primarily on *Commissioner v. First Security Bank of Utah, supra,* a case in which the Supreme Court denied the Commissioner's section 482 allocation of insurance premium income to taxpayers who were otherwise prohibited from receiving income of that nature by Federal law. As petitioner sees it, AG's income should not be increased by amounts which it could not and did not receive by virtue of Spanish law.

Respondent's primary argument is that Spanish law did not prohibit the payment of royalties by Espana to AG during the years at issue, and accordingly *First Security*

*Bank* does not impact his allocation. In respondent's view, the prohibition on the payment of royalties from Espana to AG was merely an administrative decision, arbitrarily determined and subject to appellate review which Espana voluntarily waived.

Assuming we find that Spanish law did prohibit Espana from paying royalties to AG, respondent insists that *First Security Bank* does not control this case because it is factually distinguishable. In particular, respondent finds it significant that in *First Security Bank,* Federal law served to prohibit *absolutely* the taxpayers from receiving the income in question under any circumstance. On the other hand, respondent asserts that in the case sub judice Spanish law only prohibited royalty payments from a Spanish company to its foreign parent. Respondent contends that because AG could have received royalty payments from an unrelated Spanish company, and would have demanded royalties if bargaining at arm's length, the transaction cannot withstand the analysis associated with the second prong of section 482. That is, the transaction, albeit a product of Spanish law, effects an artificial shifting of income and does not clearly reflect income. Petitioner concedes that the Supreme Court did not consider within the context of *First Security Bank* whether section 482 would apply in the face of a foreign law which proscribes payments between companies with common ownership.

As we understand the positions of the parties, we are confronted with an issue of first impression.[3] Specifically, the issue is whether a section 482 allocation is appropriately applied under the circumstances to correct the "shifting" of income associated with Spain's policy of prohibiting or blocking royalty payments from a Spanish subsidiary to its foreign parent. A review of *First Security Bank* will aid in establishing the framework for analysis of this issue.

In *First Security Bank,* two national banks, First Security Bank of Utah and First Security Bank of Idaho (the banks), wholly owned subsidiaries of First Security Corporation, made a practice of offering to arrange credit life, health, and

---

[3]No income tax treaty existed between the United States and Spain in the years in issue. The first income tax treaty between the countries was negotiated in 1990. Income Tax Treaty Between the Kingdom of Spain and the United States, Feb. 22, 1990, CCH Tax Treaties, par. 8403. The treaty is not yet in effect.

accident insurance for their borrowers. The lending officer would explain the function and availability of credit insurance, complete the necessary forms, deliver a certificate of insurance, and collect the premium or add it to the customer's loan. At that point, the banks would forward the forms and premiums to an independent insurer. The independent insurer would then reinsure the policies with Security Life, another wholly owned subsidiary of First Security Corporation. Under this arrangement, Security Life retained 85 percent of the premiums paid for the insurance, and the independent insurer, which furnished actuarial and accounting services, received the remainder.

Security Life reported the entire amount of insurance premiums in its income for the years in issue. By virtue of the lower effective tax rate applicable to life insurance companies, the total tax liability for First Security Corporation and its subsidiaries was less than it would have been had Security Life paid a part of the premiums to the banks as sales commissions. Pursuant to section 482, the Commissioner determined that in order to reflect actual income, 40 percent of Security Life's premium income was allocable to the banks as compensation for originating and processing the insurance.

The Supreme Court framed the issue to be decided as follows: whether there was a shifting or distorting of the banks' true net income resulting from the receipt and retention by Security Life of the premiums in question. At the outset, the Court noted that Federal banking laws had been interpreted to prohibit the banks from receiving a share of the insurance premiums. In addition, the Court referenced the finding of the courts below that the banks, upon advice of counsel, believed that they would violate Federal banking law by receiving income from their customers' purchases of insurance.

In concluding that the Commissioner's allocation was unwarranted, the Supreme Court emphasized that there was no shifting or distorting of income because the banks simply could not receive insurance premium income. The Court stated that section 1.482-1(b)(1), Income Tax Regs., as applied to the facts—

contemplates that [First Security Corp.]—the controlling interest—must have "complete power" to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the "true taxable income" of a subsidiary has been understated, that the Commissioner is authorized to reallocate under sec. 482. But [First Security Corp.] had no such power unless it acted in violation of federal banking laws. The "complete power" referred to in the regulations hardly includes the power to force a subsidiary to violate the law. [*Commissioner v. First Security Bank of Utah*, 405 U.S. at 404-405.[4]]

Compare *L.E. Shunk Latex Products, Inc. v. Commissioner*, 18 T.C. 940 (1952) (section 482 allocation to manufacturer from related distributor is unwarranted where manufacturer was prohibited by wartime Federal price controls from charging distributor higher prices).

Petitioner also relies on *Salyersville National Bank v. United States*, 613 F.2d 650 (6th Cir. 1980). We note that an appeal of this case would be prosecuted in the Sixth Circuit. See *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 405 U.S. 940 (1971).

In *Salyersville National Bank*, the Sixth Circuit relied on *First Security Bank* to reject the Commissioner's allocation of insurance premium income from the bank president, a licensed insurance agent, to the bank. It is interesting to note that, unlike the banks in *First Security Bank*, Salyersville National Bank could have qualified to act as an insurance agent under State law, and thus could have received insurance commissions as income. However, the appellate court found that the bank had legitimate business reasons for avoiding insurance agent status and concluded that the bank was not obligated to exercise its rights otherwise. Under the circumstances, the bank could not legally receive the premiums and the Commissioner's allocation was unwarranted.

We find *First Security Bank* and *Salyersville National Bank* compelling with respect to the issue before the Court.

---

[4]The effect of *Commissioner v. First Security Bank of Utah*, 405 U.S. 394 (1972), has been the subject of much comment and debate. See Aland, "Can IRS Use Section 482 To Allocate Income Which Cannot Be Earned Under Applicable Law?," 52 J. Taxn. 220 (1980); Teschner, "First Security Bank of Utah: Taxpayer Disability and the Supreme Court," 50 Taxes 260 (1972); Comment, "First Security Bank of Utah—Its Effect Upon The Expanded Scope of Section 482," 61 Ky. L.J. 845 (1973); Comment, "Commissioner's Authority To Allocate Income Is Limited By Taxpayer Legal Disability," 48 Wash. L. Rev. 492 (1973).

As we understand these cases, section 482 simply does not apply where restrictions imposed by law, and not the actions of the controlling interest, serve to distort income among the controlled group. Accordingly, in order to decide whether respondent's allocation is appropriate in the case sub judice, we must determine whether Spanish law prohibited or blocked Espana from making royalty payments to AG.

Rule 146 provides that in determining foreign law, this Court may consider any relevant material or source, including testimony, whether or not submitted by a party or otherwise admissible. In addition, the Court's determination shall be treated as a ruling on a question of law.

We find that Spanish law prohibited Espana from making royalty payments to AG. Of paramount importance are the express prohibitions respecting royalty payments contained in the original approval letter, issued at the time of Espana's organization, and the several approval letters Espana received between 1970 and 1978 permitting capital increases. Espana was repeatedly admonished by the Spanish Government not to pay "any amount whatsoever in the concept of fees, patents, royalties, and/or technical assistance to the investing firm nor to any of its affiliates, unless with the approval of the Administration." In addition, prior to the years in issue, the Ministry of Industry made clear through its order of December 5, 1973, that it would consider as unfavorable a provision in a technology agreement imposing royalty payments based upon the technology recipient's level of activity, where the recipient is a subsidiary of the assignor and the latter holds more than 50 percent of its capital. A similar policy was stated in Decree 3099/1976. Under the circumstances, it is clear that in order to do business in Spain, petitioner had to play by Spain's rules.

We fortify this evidence with the fact that no companies comparable to Espana were permitted to pay royalties. Espana's competitors were also prohibited from making royalty payments to their foreign parents. Moreover, although royalty payments could be made where the foreign investment provided a substantial impact on the Spanish economy, Espana's relatively small operation apparently did

not qualify. Thus, respondent's claim that the prohibition was arbitrary is without foundation.

In light of the consistency with which the royalty prohibition was applied, there is no need to identify a specific constitutional or statutory provision codifying the prohibition in order to treat the prohibition as law. See *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 187-188 (1987), affd. 865 F.2d 750 (6th Cir. 1989) (under analogous circumstances this Court interpreted the term "laws of such country" under section 1504(d) to include not only explicit constitutional or statutory provisions and explicit rules and regulations by controlling authority, but also any existing practice or policy of such foreign country). Compare section 1.964-2(b)(3), Income Tax Regs.

We decline to attach any significance to the fact that Espana did not file a formal appeal or application to have the royalty prohibition lifted. While Espana followed the advice of its Spanish counsel and refrained from paying royalties to AG, Espana's counsel did "test the waters" from time to time by way of informal communications with influential Spanish officials. On one occasion, while a formal application for lifting of the prohibition had been prepared, informal communications with Spanish officials prompted Espana's counsel to abandon his efforts. Also compelling in this regard is the testimony of respondent's expert that while an appeal of the royalty prohibition could be possible, "an appeal always puts you in a very difficult position vis-à-vis of the public administration and you could in the future be blackmailed by the official who has to approve afterwards all the dossiers in the exchange control authority."[5] Under these circumstances, there is no need "to insist upon proof the acquisition of which requires such risk." *U.S. Padding Corp. v. Commissioner,* 865 F.2d at 754.

Because Spanish law prohibited or blocked Espana from paying royalties to AG, it effectively precluded AG from receiving the same. In fact, any unsanctioned transaction may have exposed Espana and AG to criminal prosecution under the Law of Monetary Crimes. Consequently, we agree with petitioner that respondent's allocation is unwarranted.

---

[5]Respondent acknowledged on brief that the better evidence indicates that an appeal could result in consequences adverse to the appealing party.

Section 482 should not be applied to correct "a deflection of income imposed by law." *United States v. Basye*, 410 U.S. 441, 453 n. 13 (1973).

With respect to our holding, it is important to emphasize that petitioner had bona fide business purposes for seeking to retain, through AG, 100-percent ownership of Espana. Further, that petitioner was not motivated to avoid taxes is evidenced by the application petitioner filed with the Spanish Government in connection with the organization of Espana which contained a provision for royalty payments. Although Espana was expressly prohibited from paying royalties, petitioner actively sought to have the restriction lifted. It is significant that in three instances, petitioner was successful in gaining an exemption from the restriction so that it could be compensated for specific engineering services provided Espana.

On this record, as was the case in *First Security Bank*, there is no evidence whatsoever that petitioner utilized its control over its subsidiaries to manipulate or shift income amongst them. Petitioner sought to maintain 100-percent control of Espana in order to ensure that the company had direct and immediate access to additional capital and to protect its proprietary rights in a technologically competitive industry. Although petitioner possibly could have organized Espana so that royalties could be paid,[6] it was not obligated to do so. *Salyersville National Bank v. United States*, 613 F.2d 650, 655 (6th Cir. 1980). It is well established that a taxpayer need not arrange its affairs so as to maximize its taxes as long as the transaction in question has substance. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Esmark, Inc. & Affiliated Cos. v. Commissioner*, 90 T.C. 171, 197-198 (1988), affd. without published opinion

---

[6]As respondent suggests, Spanish law generally served to prohibit royalty payments only between a Spanish corporation with foreign investment in excess of 50 percent of its capital and its foreign parent and subsidiaries or affiliates. Spanish law generally did not prohibit royalty payments from a Spanish company (regardless of the percentage of foreign ownership) to an unrelated entity. Petitioner's expert testified that approval for royalty payments to unrelated concerns was easily obtained. Moreover, our finding is consistent with petitioner's expert's understanding of the policy to be furthered by prohibiting payments of royalties between Spanish companies and foreign investors. That is, Spain was attempting to forestall controlled groups from abusing royalty payments as a means for removing income from Spain untaxed. Finally, to prohibit legitimate royalty payments from a Spanish company to an unrelated entity would be inconsistent with Spain's interest in the years in issue in enhancing international investment, for it could effectively put the Spanish concern out of business.

886 F.2d 1318 (7th Cir. 1989). Moreover, section 482 does not impel the violation of a legal prohibition solely for the sake of matching income and expense. *Commissioner v. First Security Bank of Utah,* 405 U.S. 394, 404-405 (1972). Because the deflection of income in this case arose as a direct consequence of petitioner's valid business purposes and good faith compliance with Spanish law, an allocation under section 482 is inappropriate.

Respondent's arguments for distinguishing *First Security Bank* are unpersuasive. First, respondent cites no authority to support his contention that the Supreme Court's analysis in *First Security Bank* is limited to instances in which the section 482 allocation is contrary to Federal law. See Rev. Rul. 82-45, 1982-1 C.B. 89. Somewhat related is respondent's argument that our ruling permits the Secretary's authority under section 482 to be abrogated by the laws of a foreign jurisdiction. With respect to these contentions, we fail to see how the *First Security Bank* analysis differs whether considering the effect of foreign law as opposed to domestic law. As indicated, the Supreme Court focused on whether the facts supported a finding that the controlling interest utilized its power to shift income. Where the controlling interest has not utilized its power to shift income, a section 482 allocation is inappropriate. See *Hospital Corp. of America v. Commissioner,* 81 T.C. 520, 594 (1983). Simply stated, *First Security Bank* establishes that the Secretary in fact has no authority to make an allocation under the circumstances.

Respondent also attaches significance to the fact that unlike *First Security Bank,* where Federal law prohibited receipt of income, the law in this case precluded payment. As we see it, this is a distinction without a difference. If Espana could not by law make royalty payments to AG, a fortiori, AG could not receive them. In this light, respondent's contention is illogical, a non sequitur. To the extent that AG did not and could not receive payment, *First Security Bank* controls. In addition, we do not find it significant that Spanish law only precluded royalty payments among companies with common ownership. Although the Supreme Court did not address this specific issue within the context of *First Security Bank,* the analysis therein does

not support respondent's position. Rather, again, the proper focus is whether control was utilized to shift income. As we find that petitioner did not exercise its control so as to shift income, the threshold for application of section 482 is lacking, and thus there is no need to proceed with the section 482 analysis.

Finally, respondent suggests that if section 482 does not apply under the circumstances presented, the Court has effectively rendered section 1.482-1(d)(6), Income Tax Regs., meaningless.[7] Respondent references Rev. Rul. 74-245, 1974-1 C.B. 124, which provides that section 1.482-1(d)(6), Income Tax Regs., will be liberally administered to allow a taxpayer relief from a section 482 allocation, by permitting deferral of the allocated income, where the payments allocated could not be effected under foreign law. Respondent emphasizes that the regulation contemplates that if the taxpayer elects to defer the allocated income, the taxpayer must likewise defer expenses relating to that income so as to ultimately match income and expense. In this case, petitioner did not elect to proceed under the regulation and claims that the regulation does not apply in the face of a Spanish law prohibiting payment of specific income.

---

[7]Sec. 1.482-1(d)(6), Income Tax Regs., provides:

(6) If payment or reimbursement for the sale, exchange, or use of property, the rendition of services, or the advance of other consideration among members of a group of controlled entities was prevented, or would have been prevented, at the time of the transaction because of currency or other restrictions imposed under the laws of any foreign country, any distributions, apportionments, or allocations which may be made under section 482 with respect to such transactions may be treated as deferrable income or deductions, providing the taxpayer has, for the year to which the distributions, apportionments, or allocations relate, elected to use a method of accounting in which the reporting of deferrable income is deferred until the income ceases to be deferrable income. Under such method of accounting, referred to in this section as the deferred income method of accounting, any payments or reimbursements which were prevented or would have been prevented, and any deductions attributable directly or indirectly to such payments or reimbursements, shall be deferred until they cease to be deferrable under such method of accounting. If such method of accounting has not been elected with respect to the taxable year to which the allocations under section 482 relate, the taxpayer may elect such method with respect to such allocations (but not with respect to other deferrable income) at any time before the first occurring of the following events with respect to the allocations:

(i) Execution by the taxpayer of Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(ii) Expiration of the period ending 30 days after the date of a letter by which the district director transmits an examination report notifying the taxpayer of the proposed adjustments reflecting such allocations or before July 16, 1968, whichever is later; or

(iii) Execution of a closing agreement or offer-incompromise.

By virtue of our holding that section 482 does not apply, the regulations underlying section 482 likewise do not apply. We note that section 1.482-1(d)(6), Income Tax Regs., was prescribed by Treasury Decision 6952 on April 15, 1968, prior to the *First Security Bank* decision. See 1968-1 C.B. 218. Thus, no consideration was given to the effect of *First Security Bank* on the scope of the regulation. Notwithstanding the foregoing, our ruling does not render section 1.482-1(d)(6), Income Tax Regs., meaningless. Rather, we only limit the application of the regulation within the narrow confines of the facts presented in this case. Specifically, section 482 does not apply where the taxpayer's legitimate business purposes subject it to legal restraints effectively blocking receipt of income. We do not have before us, and therefore do not address, whether a section 482 allocation may be appropriate where legitimate business purposes are lacking.

Petitioner has not utilized its control over AG and Espana so as to improperly shift income. Rather, there has been a deflection of income by operation of Spanish law. Under the circumstances, an allocation under section 482 is unwarranted.

To reflect the foregoing,

*Decision will be entered under Rule 155.*