T.C. Memo. 1996-152


UNITED STATES TAX COURT


TOWER LOAN OF MISSISSIPPI, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 570-93.                    Filed March 26, 1996.


<u>Leonard D. Van Slyke, Jr.</u>, and Denise F. Schreiber
(specially recognized), for petitioner.

<u>Thomas R. Ascher</u> and <u>Kim A. Palmerino</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax for 1988 and 1989 of $370,317 and
$490,267, respectively.

The issues for decision are: (1) Whether certain commission
income should be reallocated to petitioner from petitioner's

wholly owned subsidiary pursuant to section 482.[1]  We hold that it should not. (2) Whether petitioner can take a bad debt deduction pursuant to section 166 for the 1989 tax year.  We hold that it cannot.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and its accompanying exhibits are incorporated herein by this reference. At the time the petition was filed herein, petitioner, Tower Loan of Mississippi, Inc., had its principal place of business in Jackson, Mississippi.

Petitioner is engaged in the business of making small consumer loans, ranging from $100 to $5,000.  Petitioner is not a bank or a savings and loan association.  Petitioner was incorporated in 1972 as a business corporation under the Mississippi Business Corporation Act.  Petitioner used the accrual method of accounting during the years in issue.

In February 1983, petitioner organized two wholly owned subsidiary insurance companies, the American Federated Life Insurance Co. (AFLIC) and the American Federated Insurance Co. (AFIC).  In addition to providing financing to its customers, petitioner makes available credit life insurance to its

---

[1] All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.

customers.  Prior to its organization of AFLIC and AFIC in 1983, petitioner had received and retained a portion of the premium payments from the sale of the credit life insurance.  However, petitioner was sued by several customers who claimed that because petitioner received insurance commissions, effectively, the loans were usurious and unenforceable.  Other finance companies were being sued on this theory as well.  The primary purpose for the formation of the insurance companies was to avoid the legal problems associated with petitioner's charging and receiving premiums from the sale of credit life insurance.  AFIC is in the business of providing property and casualty insurance.  AFIC files consolidated returns with petitioner.

AFLIC is primarily in the business of providing credit life and disability insurance.  AFLIC files its returns separately from petitioner.[2]  AFIC and AFLIC continued to exist as wholly owned subsidiaries of petitioner during the years in issue. Petitioner gives its customers the option of purchasing credit insurance for their loans.[3]  Credit insurance policies offer protection to the creditor and debtor by providing for payment of the loan in the event of certain occurrences such as death or

---

[2] Pursuant to sec. 1504(b)(2), AFLIC is not an includable corporation and therefore is not eligible to file in the consolidated returns.

[3] Petitioner also offers property insurance.  We will not discuss property insurance policies, as they are not relevant to the issues in this case.

disability of the debtor, depending on the type of policy. Prior to the formation of AFLIC, petitioner employed licensed insurance agents who sold insurance policies underwritten by outside insurance companies. Petitioner was not and never has been licensed under Mississippi law as an insurance agent; it has always employed licensed agents who sold the insurance. Some portion of the premiums from these sales was remitted to petitioner as commissions.

After the formation of AFLIC, petitioner offered only AFLIC credit insurance to its customers. Petitioner required all of its branch managers to acquire a license to sell the insurance. If a customer chose to purchase insurance, then the premiums were added to the amount of the loan. Petitioner would then remit the entire premium amount to AFLIC. AFLIC would not pay the licensed branch managers or petitioner commissions or other compensation for selling AFLIC insurance. Petitioner, however, would pay bonuses to its licensed branch managers based on the amount of insurance each manager sold.

AFLIC sells credit insurance to debtors of other creditors besides petitioner through agents who are not employees of petitioner. AFLIC pays these other agents sales commissions, usually between 45 and 65 percent of the premium.

AFLIC has no employees or offices. It does not advertise. It pays another company to do its tax returns, compute its reserves, and do its actuarial work.

On its amended 1988 and 1989 U.S. Life Insurance Company Income Tax Returns, Forms 1120L, AFLIC respectively reported $3,000,498 and $2,958,091 in gross premiums and respectively took deductions for commissions paid in the amounts of $1,366,543 and $1,360,371.[4]

Respondent sent petitioner a notice of deficiency dated October 28, 1992, which included increases to petitioner's gross income in the amounts of $1,083,197 and $1,140,414, for the years 1988 and 1989, respectively, to clearly reflect commission income from the sale of credit insurance during 1988 and 1989.

On or about September 23, 1985, Matheney Ford, Inc. (Matheney Ford), executed a loan agreement and promissory note (the loan agreement) whereby AFLIC and AFIC agreed to and did lend Matheney Ford $225,000. The president of Matheney Ford was George O. Cooper, Jr. (Cooper). AFIC and AFLIC were granted a security interest in Matheney Ford's used cars and certain accounts. Cooper executed a guaranty for Matheney Ford's debt. As security for his guaranty, Cooper and his wife executed a deed of trust on their residence in favor of AFLIC and AFIC. The deed of trust was subordinate to a first deed of trust held by Trustmark National Bank (Trustmark) as security for promissory

---

[4] AFLIC's commission deductions include the commission income allocated to petitioner under sec. 482. The commission deductions were claimed on the amended return to preserve the deduction in the event respondent prevailed on the proposed sec. 482 adjustment.

notes that Cooper executed to Trustmark (the Trustmark notes).
The loan agreement further provided for the assignment to AFIC
and AFLIC of life insurance policies issued by Lamar Life
Insurance Co. (the Lamar policies) on Cooper's life. In January
1986, Mrs. Cooper, the owner of the Lamar policies, so assigned
the Lamar policies.

Matheney Ford defaulted on the loan, leaving Cooper indebted
to AFLIC in the amount of $140,000 (hereinafter sometimes
referred to as the Cooper debt). On May 24, 1988, the Coopers
and AFLIC executed a second loan agreement (the second loan
agreement). Under the second loan agreement, AFLIC agreed to
purchase the outstanding Trustmark notes and the Trustmark deed
of trust for $210,000 and to renew Cooper's $140,000 indebtedness
in exchange for new promissory notes from the Coopers. In
accordance with the second loan agreement, the Coopers executed
the following, with AFLIC as payee: (1) A promissory note in the
amount of $328,500 and (2) a nonrecourse promissory note in the
amount of $21,500. The second loan agreement provided that the
Lamar policies remained assigned to AFLIC.

AFLIC foreclosed on the deed of trust, purchased the Cooper
residence, and subsequently sold it, applying the proceeds to
reduce the Coopers' debt. On or about June 22, 1989, Cooper and
AFLIC entered into a third loan agreement (the third loan
agreement), whereby they agreed to refinance the Coopers'
indebtedness by having Cooper execute a new promissory note to

AFLIC for the balance of the debt, $93,595, payable in installments beginning January 15, 1990. The third loan agreement further provided that Mrs. Cooper would be released from liability, but that the Lamar policies would remain assigned to AFLIC. On or about July 21, 1989, AFLIC assigned all its interest in the third loan agreement to AFIC.

Cooper was sent to prison sometime in 1989. As of December 1989, the Lamar policies had a total cash value of $853. On its 1989 Federal income tax return petitioner claimed a bad debt deduction in the amount of $118,356 relating to the debts of AFIC.[5]

OPINION

Issue 1. Section 482 Issue

Petitioner sold credit insurance policies written by AFLIC, its wholly owned subsidiary, to its customers. Petitioner remitted all the premiums to AFLIC and, in turn, received no commissions or payments for selling the insurance. Respondent, pursuant to section 482, reallocated 45 percent of the premiums as commission income to petitioner.

Section 482 provides, in pertinent part, as follows:

---

[5] Of the disallowed $118,356, $104,641 stems from the Cooper debt. Respondent disallowed the balance, $13,715, because petitioner failed to establish that a debt existed or became worthless during 1989. Petitioner fails to address the $13,715. We therefore assume that petitioner concedes that amount, and we so find. Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987).

In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. * * *

Section 1.482-1(b)(1), Income Tax Regs., explains the purpose of section 482 as follows:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * *

Generally put, section 482 is designed to prevent artificial distorting of the true net incomes of commonly controlled entities. The Commissioner has broad discretionary power to allocate income, and a heavier than normal burden is placed on the taxpayer to prove that the allocation is arbitrary or unreasonable. Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 331 (1990), affd. 961 F.2d 1255 (6th Cir. 1992). In meeting its burden, petitioner must show that it did not improperly utilize its control to shift income. Id.

Petitioner concedes that it and AFLIC are under common control. Petitioner, however, argues that it did not improperly utilize its control over itself and AFLIC to shift commission income from itself to AFLIC, because under Mississippi law it would have been illegal for petitioner, during the years in

issue, to receive the commission income.  Petitioner, in this regard, relies primarily on the Supreme Court's decision in Commissioner v. First Security Bank, 405 U.S. 394 (1972), a case whose facts are strikingly similar to those now before us.  In First Security, two banks, wholly owned subsidiaries of a holding company, offered credit insurance to their borrowers.  The premiums would be forwarded to an independent insurer, which would then reinsure the policies with an insurance company which was also wholly owned by the holding company.  The subsidiary insurance company would receive 85 percent of the premiums, and the outside insurance company, which furnished actuarial and accounting services, kept the remaining 15 percent.  The banks received no commissions or payments for selling the insurance. The Commissioner, pursuant to section 482, determined that a percentage of the premiums was allocable to the banks to properly reflect commission income.

The Supreme Court set aside the Commissioner's allocation. The Court emphasized that, under Federal law, the banks were prohibited from receiving commissions.  Id. at 401.  Since the banks could not have legally received that income, the Court determined that the holding company did not improperly utilize its control over its subsidiaries to distort income.  Id. at 403-404.  In its analysis, the Court found no decision of the Supreme Court wherein a person had been found to have taxable income that he did not receive and that he was prohibited from receiving.

Id. at 403.  Moreover, in cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it.  Id.  The underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it.  Id. (citing Corliss v. Bowers, 281 U.S. 376, 378 (1930)).

We understand the Supreme Court's opinion to forbid allocation of income to a taxpayer when restrictions imposed by law prohibit the taxpayer from receiving such income.  See Procter & Gamble Co. v. Commissioner, supra at 336; see also Salyersville Natl. Bank v. United States, 613 F.2d 650 (6th Cir. 1980); Bank of Winnfield & Trust Co. v. United States, 540 F. Supp. 219 (W.D. La. 1982).  Thus, if we find that Mississippi law made it illegal for petitioner to receive commissions during the years in issue, we must hold for petitioner.  See Procter & Gamble Co. v. Commissioner, supra at 336.

Petitioner argues that Miss. Code Ann. secs. 83-17-105 and 83-17-7 (1973) prohibited it from receiving commissions during the years in issue.  For those years, Miss. Code Ann. sec. 83-17-105 states in pertinent part:

> No insurer or agent doing business in this state shall pay, directly or indirectly, any commission or any other valuable consideration to any person for services as an agent within this state unless such person shall hold a currently valid license and certificate of authority to act as an agent, as required by the laws of such state.  Nor shall any person other than a duly licensed agent accept any such commission or other valuable consideration. * * *

Miss. Code Ann. sec. 83-17-7 likewise states:

> It shall be unlawful for any insurance company or
> any insurance agent to pay, directly or indirectly, any
> commission, brokerage or other valuable consideration
> on account of any policy or policies written on risks
> in this state to any person, agent, firm or corporation
> not duly licensed as an insurance agent in this state,
> * * *.

These statutes seem to forbid commission payments to petitioner,
as petitioner is not a "duly licensed agent".  Respondent,
however, cites Miss. Code Ann. sec. 83-53-25(1)(1973), which
states as follows:

> No one shall pay, accrue, credit or otherwise
> allow, either directly or indirectly, any compensation
> to any creditor, person, partnership, corporation,
> association or other entity in connection with any
> policy, certificate or other contract of credit life
> insurance or credit disability insurance which exceeds
> forty-five percent (45%) of the premium rates approved
> for such policy, certificate or contract.

A similar regulation, limiting the amount allowable as
compensation to any "creditor or agent" for the sale of credit
life insurance, was in place during the years in issue.
Mississippi Insurance Department Reg. No. LA & H 82-102.[6]  The
Supreme Court of Mississippi addressed this apparent conflict

---

[6]    Miss. Ins. Dept. Reg. No. LA & H 82-102, sec. VII
provides:

> No insurance company shall pay, credit or otherwise allow
> any compensation or other valuable consideration, either
> directly or indirectly to any creditor or agent for the sale
> of any policy, certificate or other contract of credit
> insurance which exceeds fifty percent of the premium rates
> specified for such policy, certificate or contract.

among the statutes in <u>Tew v. Dixieland Finance, Inc.</u>, 527 So. 2d 665 (Miss. 1988).

<u>Tew</u> involved a small loan company which, like petitioner, sold credit life insurance through licensed employees. Like petitioner, the loan company itself was not licensed to sell insurance. The loan company brought suit against a borrower who had defaulted on his loan. The borrower counterclaimed, asserting that the loan company's receipt of commissions on his purchase of credit life insurance from the loan company was in violation of Miss. Code Ann. sec. 83-17-105--as the loan company was not a licensed agent--and in violation of Miss. Code Ann. sec. 75-67-121.

In <u>Tew</u>, before deciding the issue of whether the loan company violated section 83-17-105, the court noted that it was common practice in the industry for unlicensed creditors to receive commissions for the sale of credit insurance. <u>Id.</u> at 670. Furthermore, the court cited Miss. Code Ann. sec. 83-53-25 and Ins. Dept. Reg. 82-102 as evidence that the Mississippi Legislature and Department of Insurance have recognized that unlicensed creditors may receive commissions. <u>Id.</u> at 670-671. However, the court emphasized that these "regulations ignore the inconsistency of these provisions with Miss. Code Ann. §83-17-105 (Supp. 1987) which prohibits the payment of any commission to any person who is not a licensed agent". <u>Id.</u> at 671. Accordingly, the court held "that the receiving of * * * [the] commission by

Dixieland [i.e., the loan company] from its sale of insurance is in violation of the Miss. Code Ann. section 83-17-105". Id. Because of the reliance placed on the Department of Insurance regulations, the court made its ruling prohibiting an unlicensed agent from collecting commissions prospective to cases arising on and after July 1, 1989. Id. at 673. The court chose a prospective date to allow the Legislature and Executive Departments to deal with the inconsistencies noted. Id.[7]

Petitioner argues that the prospective language in Tew relates only to the private cause of action asserted by the defendant against the loan company, not to the legality of the loan company's actions. Thus, petitioner argues, it would have been illegal for it to receive commissions even prior to July 1, 1989. We agree. The Mississippi Supreme Court clearly held that the receiving of commissions by the loan company from the sale of credit insurance was in violation of Miss. Code Ann. sec 83-17-105, which required it to be a licensed agent to receive commissions. Id.

Neither party disputes the rule of Commissioner v. First Security Bank, 405 U.S. 394 (1972), wherein the Supreme Court held that the Commissioner's allocation of income to a taxpayer

---

[7] The statutes in question were not amended after Tew v. Dixieland Finance, Inc., 527 So. 2d 665 (Miss. 1988). However, on July 1, 1989, the Department of Insurance promulgated Ins. Dept. Reg. 89-102 to specifically allow an unlicensed creditor which sells credit insurance through its licensed employees to receive commissions.

pursuant to section 482 was inappropriate when the taxpayer's receipt of such income was prohibited by local law.  The Court concluded that section 1.482-1(b)(1), Income Tax Regs., contemplated that the controlling interest, i.e., the holding company, must have "complete power" to shift income among its subsidiaries.  Id. at 404.  Section 1.482-1(b)(1), Income Tax Regs., provides, in pertinent part, as follows:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. * * *

Thus, the Court continued, it is only when this power exists, and has been used to understate the controlled taxpayer's true income, that the Commissioner is authorized to reallocate income under section 482.  Id.  The Court concluded that the holding company did not have the "complete power" to shift income between its controlled interests unless it violated the Federal banking laws.  Moreover, the Court concluded that the "complete power" referred to in the regulations hardly includes the power to force a subsidiary to violate the law.  Id. at 405.

Applying the same type of analysis, we hold that petitioner could not have received commission income from AFLIC without violating Mississippi State law as provided in Miss. Code Ann. secs. 83-17-105 and 83-17-7 (1973) and as construed by the Mississippi Supreme Court in Tew v. Dixieland Finance, Inc.,

supra.  See Estate of Bosch v. Commissioner, 387 U.S. 456 (1967).
Petitioner has not utilized its control over AFLIC so as to
improperly shift income.  Rather, there has been a deflection of
income by operation of Mississippi State law.  See Procter &
Gamble Co. v. Commissioner, 95 T.C. at 341.

Accordingly, we hold that an allocation under section 482 is
unwarranted and an abuse of the respondent's discretion.

Issue 2. Bad Debt Deduction

Petitioner took a deduction under section 166(a) for the
Cooper debt which AFLIC assigned to AFIC in July 1989.[8]

Section 166(a) provides a deduction for any debt which
becomes worthless during the taxable year.  The amount of the
deduction for a bad debt is limited to the taxpayer's adjusted
basis in the debt as provided in section 1011.  Sec. 166(b);
Perry v. Commissioner, 92 T.C. 470, 477-478 (1989), affd. without
published opinion 912 F.2d 1466 (5th Cir. 1990).  Whether, and
when, a debt becomes worthless is determined by looking at all
the facts and circumstances including the value of the
collateral, if any, securing the debt and the financial condition
of the debtor.  Sec. 1.166-2(a), Income Tax Regs.  Generally, a

---

[8]     Since AFIC was a member of the affiliated group with
petitioner, AFIC's operations were included in the consolidated
filing.  Sec. 1.1502-76(b)(1), Income Tax Regs.  The common
parent shall be the sole agent for each subsidiary in the group.
Sec. 1.1502-77(a), Income Tax Regs.  As common parent, petitioner
is authorized to petition and conduct proceedings before the
Court on behalf of all members of the group.  Id.

debt will be considered worthless only when it can be reasonably expected that the debt is without possibility of future payment and legal action to enforce the debt would not result in satisfaction.  Hawkins v. Commissioner, 20 T.C. 1069 (1953). Petitioner bears the burden of proof, Rule 142(a), and must show that the debt had value at the beginning of the taxable year in question--in this case 1989--and that it became worthless during and prior to the end of that year, Millsap v. Commissioner, 46 T.C. 751, 762 (1966), affd. 387 F.2d 420 (8th Cir. 1968).

We have found the amount of the debt, as assigned to AFIC in 1989, to be $93,595.  Of that amount, petitioner concedes that $853, the cash value of the Lamar policies, is not deductible as a bad debt.

Petitioner proposes no findings of fact and makes no arguments supporting its position that the debt became worthless in 1989 other than that Cooper began serving a prison sentence during 1989.  The only evidence submitted by petitioner pertaining to the worthlessness of the debt is Jack Lee's subjective testimony on the matter.[9]  Lee testified as follows:

Q.  Well, prior to his going to prison, what effort did you make -- after the business went defunct, what efforts did you make to collect on the loan?

A.  We went through a long history of George trying to collect.  He went from -- after the thing -- after Cooper Ford went broke, then he bought the restaurant

[9]    Lee is chairman, chief executive officer, and part owner of petitioner.

on Highway 80; I forget the name of it.  And he didn't make it with the restaurant.

[Trustmark] had a lien on his house, and I had a buyer for the house, so I went up there and got [Trustmark] to sell me their position.  And we subsequently foreclosed on that house, and I did make some money, which reduced the debt some on the settlement of that house. * * *

Q.   And after that occurred, what happened to make you finally conclude that the loan was uncollectible?

A.   Well since that time -- since he lost -- it was Fisherman's Wharf was the restaurant -- since he lost that restaurant, and he went to prison in my knowledge George has never worked since then.

We assume that the loan that Lee was referring to was the original loan in 1985, which was refinanced in 1988 and again in 1989.  The parties have treated the 1989 note as merely a continuation of the debt which was refinanced in 1988 by AFLIC, and we see no difference in result by doing the same.

Assuming the 1989 note was a continuation of the earlier debt, without anything more than Lee's testimony, we are not persuaded that the debt was worthless.  The only evidence that petitioner (or AFLIC) attempted to collect on the debt was the purchase of the Coopers' home in the 1988 foreclosure sale. Petitioner has not shown that Cooper was without any other assets which could have provided payment in an action to collect on the debt.  Moreover, even if the debt was worthless, the record does not establish that it became worthless in 1989.  Matheney Ford became insolvent no later than 1988.  AFLIC foreclosed on the

Coopers' house and sold it in 1988.  Accordingly, petitioner has failed to meet its burden of proof.

We add that if the 1989 note is viewed as a separate debt from the earlier debt, petitioner has failed to show that such debt had value when created, or when acquired by AFLIC.  Without that showing, a deduction is not permitted.  See, e.g., <u>Garrett v. Commissioner</u>, 39 T.C. 316, 317 (1962).

Finally, petitioner has failed to prove AFIC's basis in the note, which is required in order to take a section 166 deduction.  Sec. 166(b).  Normally, for section 166(b) purposes, a taxpayer's basis in property is the cost of such property.  Secs. 1011 and 1012.  The assignment agreement stated that the assignment was "For a valuable consideration, the receipt and sufficiency of which is hereby acknowledged".  Lee testified that AFIC reimbursed AFLIC for the amount of the debt; i.e., that AFLIC furnished consideration for the debt.  However, we have found no evidence of any such payments and would not, therefore, be able to determine the amount allowable as a deduction under section 166.  Accordingly, we sustain respondent's disallowance of petitioner's bad debt deduction.

<u>Decision will be entered</u>

<u>under Rule 155</u>.